Filed 5/19/11

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

      Plaintiff and Respondent,

      v.

SEAN VENYETTE VINES,

      Defendant and Appellant.

S065720

Sacramento County
Super. Ct. No. 94F08352

A Sacramento County jury convicted defendant Sean Venyette Vines of the first degree murder of Ronald Lee (Pen. Code, § 187; all further statutory references are to the Penal Code unless otherwise indicated) and found true a special circumstance allegation that defendant murdered Lee while engaged in the commission of a robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)). It also convicted defendant of eight counts of robbery (§ 211), five counts of assault with a deadly weapon (§ 245, subd. (a)(2)), four counts of kidnapping to commit robbery (§ 209, subd. (b)), four counts of false imprisonment (§ 236), and two counts of being a felon in possession of a firearm (§ 12021, subd. (a)). As to 19 of the counts, the jury found true allegations that defendant personally used a firearm during the commission of the crimes. (§ 12022.5, subd. (a).) The trial court found true two prior conviction allegations, one within the meaning of sections 667 and 1170.12, and one within the meaning of section 667.5, subdivision (b).

1

The jury set the penalty for defendant's murder conviction at death, and the trial court sentenced him accordingly. This appeal is automatic. (§ 1239, subd. (b).)

## I. GUILT PHASE

### A. Facts

#### 1. Introduction

On September 17, 1994, someone robbed the McDonald's restaurant on Watt Avenue in Sacramento. Eleven days later, on September 28,[1] another McDonald's restaurant, on Florin Road in Sacramento, was robbed and employee Ronald Lee was killed by a gunshot to the back of his head. Defendant was employed at the Watt Avenue restaurant on the date it was robbed and previously had worked at the Florin Road restaurant.

#### 2. Watt Avenue Robbery

##### a. Prosecution case

In September 1994, defendant and William Deon Proby worked at the Watt Avenue McDonald's restaurant. Two or three weeks before the robbery, while working the closing shift, defendant asked one of the managers, Charles Ruby, Jr., about procedures in the event of a robbery. Ruby told him that employees and managers were supposed to give the robbers the money without resistance. Defendant chuckled and replied, "We are going to get robbed."

On September 17, the day of the Watt Avenue robbery, defendant was scheduled to work the closing shift at the restaurant, but called in to say he would be unable to come to work. Manager Stanly Zaharko and employees John

---

[1] Unless otherwise specified, all dates refer to 1994.

2

Burreson, Michael Baumann, and Leticia Aguilar worked the closing shift that evening. Only Zaharko had access to the safe.

The restaurant was scheduled to close at midnight. About 11:45 p.m., Baumann saw someone enter the restaurant and go into the bathroom. Although he got only a quick glimpse of the side of the person's face, Baumann was certain it was defendant.

Just after midnight, Zaharko closed the restaurant and began to lock the doors and make sure that no one other than the employees was still on the premises. Checking the men's restroom, Zaharko saw that someone was in a stall. He realized it was not an employee when he saw all the employees in the front counter and grill area of the restaurant a few moments later. About 12:15 a.m., Zaharko headed toward the restroom to tell the person to leave. As he rounded the corner of the lobby, he saw a man walking out of the restroom with a gun in his hand. The man was a dark-skinned African-American between the ages of 18 and 25, about six feet tall and weighing about 200 pounds.[2] He was wearing faded jeans, a green jacket with a hood over his head, and a green scarf wrapped around his face.

Believing the restaurant was being robbed, Zaharko raised his hands. The robber raised his gun and pointed it at Zaharko. The robber approached to within three feet of Zaharko, who, still facing the robber, walked backward to the counter area where the safe was located. Although he was not absolutely certain, Zaharko believed the robber was defendant.

---

[2] Defendant, who is African-American, stands six feet three inches tall and was 21 years old at the time of the offenses.

When they reached the safe, defendant, using an unnaturally low, gravelly voice, ordered Zaharko to open it. He had the gun pointed at the back of Zaharko's head. After Zaharko opened the safe, defendant ordered him to hand over the keys. Zaharko complied by placing both the store keys and his personal keys on top of the safe. Defendant then directed Zaharko to the back of the restaurant, where the other employees were standing beside a sink. Still disguising his voice, defendant told all the employees to go downstairs. As they proceeded single file down the basement stairway, which was not visible from the customer side of the front counter, defendant kept his gun pointed at them. Aguilar recognized defendant, with whom she had worked as many as a dozen times, most recently the preceding day, as the robber. Defendant instructed them to enter the walk-in freezer. Before doing so, Baumann turned to face defendant, thinking of trying to take his gun. Baumann recognized defendant and, after looking into the robber's eyes, was even surer it was defendant.[3] Once the employees were inside the freezer, defendant slammed the freezer door and locked it; although the freezer's lock was inoperable, a metal bar had been fabricated to connect with an eyelet mounted on the wall to permit locking the freezer. Defendant had several times previously locked the freezer using this prefabricated latch.

After waiting about 10 minutes, Zaharko and the other employees used an ax that was stored in the freezer to break through the door and escape. In the course of escaping, Zaharko injured his hand. One of the employees called 911, and they waited in the basement until the police arrived.

---

[3]    Although at one point in his direct examination Baumann indicated he did not recognize defendant as the robber, he later testified he had not been truthful in that part of his testimony because he feared losing his family. He affirmed his certainty that defendant was the robber.

Upstairs, Zaharko saw that the safe had been ransacked. About $2,000 had been stolen, and Zaharko's canvas attaché bag and Dodge Dakota truck, which he drove to work every day and routinely parked in the same spot, also were missing. About a month before the robbery, Zaharko had given defendant a ride home from work in the truck. Zaharko told the officers he believed defendant was the robber and described him as a dark-complected Black male, about 21 years old, six feet tall, and weighing 210 pounds.

Vera Penilton, Proby's girlfriend, testified that after the robbery defendant and Proby picked her up at her mother's house and drove to the Rodeway Inn on Watt Avenue. She brought her newborn baby with her. Defendant and Proby were driving a truck, and Penilton saw a nametag bearing the name "Stanly" on the floor of the vehicle. Defendant and Proby previously had told her they planned to rob the McDonald's restaurant where they worked, and now told her about the robbery. Defendant said he committed the robbery by himself because Proby got scared and waited in the car. Defendant described waiting in the bathroom before robbing the restaurant and locking the employees in the freezer. He also told Penilton he hated his manager, Zaharko, and was going to shoot him, but did not do so. As he said this, he was laughing. Penilton saw that defendant and Proby had "a lot of money" and defendant had a small silver handgun.

At some point, defendant and Proby tried to clean the truck and wipe off any fingerprints. They threw some things from the truck into a trash can behind a restaurant and tried to burn the truck. Finally, they left the truck near a Denny's restaurant in the Target shopping center on Mack Road.

Defendant had taken the cellular phone that was in Zaharko's truck. Between 4:53 and 4:57 a.m. on September 18, the phone was used to call Ulanda Johnson's home telephone and pager numbers and Sonya Williams's home telephone number. Defendant had relationships with both women.

5

That same night, defendant picked up Sonya Williams at her home and brought her to the Rodeway Inn, where they met Proby and Penilton. Along the way, Williams noticed defendant had a small silver gun on his lap. He told her "he did what he said he was going to do or what he talked about," and showed her a wad of bills. (Two to three weeks earlier, defendant had told Williams that he and Proby were going to rob the McDonald's restaurant where he worked.) Defendant elaborated that he had committed the robbery with Proby; the two men had shared the proceeds, with $900 going to defendant and $700 to Proby; and they had used Proby's car. Defendant told Williams that during the robbery he came out of the bathroom, put a gun to a man's face, put everyone in the freezer, and took the money. When Williams asked defendant something to the effect of "What if you had killed those people that were in the freezer?" he calmly replied, "So?"[4] After they checked into the motel, with defendant presenting his identification, Williams counted the wad of bills defendant had shown her earlier; it totaled about $260 in $5 and $1 bills.

---

[4] On September 30, Detective Danny Minter of the Sacramento County Sheriff's Department interviewed Williams regarding the Watt Avenue robbery. Detective John Cabrera of the Sacramento Police Department, who was investigating the Florin Road robbery murder, was also present. During the interview, Williams recounted many statements defendant had made to her about the Watt Avenue robbery as they drove to the Rodeway Inn. At trial, Williams claimed she could not remember many of the details of that conversation, or denied defendant had ever made such statements. The trial court allowed the prosecution to play excerpts of the videotaped interview to impeach Williams with her prior inconsistent statements. Even after seeing those excerpts, however, Williams often claimed not to remember making the earlier statements. Detective Minter also testified regarding statements Williams had made during the interview that were inconsistent with her trial testimony. On cross-examination, Williams asserted she had made up all of the statements she had attributed to defendant concerning the robbery because she was angry at him.

6

Defendant and Williams stayed at the Rodeway Inn for three nights. When they checked out on September 20, defendant paid the bill in cash.

The day after the robbery, defendant went to the Watt Avenue restaurant to work the closing shift. Charles Ruby, Jr., who had learned of the robbery, told Lisa Lee, the general manager of the restaurant, about his earlier conversation with defendant in which defendant had predicted they would be robbed. Lee later said, loudly enough for defendant to hear, that the police had an idea about who had robbed the restaurant and would be coming back that night to talk to some people. Defendant dropped a basket of fries and became very nervous. After that night, defendant never worked at the restaurant again.

That same day, Zaharko's truck was found at the Target shopping center on Mack Road. Defendant had worked at the Denny's restaurant at the same shopping center while employed at the McDonald's restaurant on Florin Road. When he got the truck back, Zaharko noticed that some items, including his cellular phone, were missing, and he found a bullet behind the driver's seat that proved to be a .25-caliber ACP (automatic cartridge for pistol).

Sean Gilbert worked with defendant and Proby at the Watt Avenue McDonald's. A week or two before the robbery, defendant told Gilbert he owned a rifle or shotgun. Not more than a week before the robbery, Proby showed Gilbert a chrome-colored .25-caliber semiautomatic handgun.

The day after the robbery, Gilbert saw defendant at work with a new Starter brand team jacket and a new Walkman. A couple of days after the robbery, Ruby saw defendant with what appeared to be a new red leather team jacket and a new portable compact disc player.

7

#### b. Defense case

The defense presented the testimony of several witnesses in an effort to cast doubt on the eyewitness identifications. John Burreson, who was working at the Watt Avenue McDonald's at the time of the robbery, testified that defendant walks with a limp and he did not notice the robber doing so. Burreson did not recognize defendant as being the robber, but acknowledged he never looked at the robber's face and only saw him take three or four steps. In an interview with a police officer on the night of the robbery, Michael Baumann indicated he thought defendant was the robber, but did not say he was sure. In a later interview with Detective Minter, however, Baumann positively identified defendant as the robber. In a March 1995 interview, Baumann told defense investigator Marilyn Mobert that the robber "kind of looked like" defendant and, when Mobert showed him a photo of Vera Penilton's cousin, Anthony Edwards, Baumann indicated that Edwards's nose, mouth, and complexion were similar to the robber's.[5]

### 3. *Florin Road Robbery and Murder*

#### a. Prosecution case

After the Watt Avenue robbery, defendant told Proby and Penilton he wanted to "do another lick," i.e., commit another robbery. During September 1994, the month in which the two robberies occurred, Ulanda Johnson testified defendant and Proby were good friends and saw each other every day; she teased defendant that Proby was his "girlfriend."

---

[5] Neither Zaharko, Baumann, Aguilar, nor Burreson, who were all shown the photo of Edwards, ever identified him as the robber.

On September 27 or 28,[6] defendant accompanied one of Johnson's friends, Deborah Allen, to a residence on Hillsdale Boulevard in Sacramento so she could retrieve some of her property. Allen testified defendant was holding a small silver gun.

Defendant and Proby were seen together on September 28, both before and after the Florin Road robbery, at Penilton's and Johnson's residences. Defendant was carrying his black backpack when he left Johnson's house that evening.

Jeffrey Hickey was the manager in charge of the closing shift at the Florin Road McDonald's on September 28. Also working that shift were Ronald Lee, Pravinesh Singh, and Jerome Williams. Previously, from October 1993 to April 1994, defendant had worked at the same restaurant. Hickey, Lee, and defendant had worked the same shift together about a dozen times.

The restaurant was scheduled to close at 11:00 p.m. About 10:40 p.m., Hickey entered the men's restroom, propped open the door, and began to scrub graffiti off the wall. A loud aluminum fan made it difficult to hear what was going on elsewhere in the restaurant. While Hickey was cleaning the wall, an African-American man standing about Hickey's own height (5 feet 10½ inches tall), weighing about 165 pounds, and wearing a baseball cap and a scarf over the lower portion of his face, whom Hickey later identified as Proby, came into Hickey's view in the doorway. Pointing what appeared to be a sawed-off rifle at Hickey, Proby told him to lie down on the floor, and Hickey complied. Proby left the bathroom and headed toward the main area of the restaurant, but returned after about two minutes and asked Hickey if he could open the safe. Still pointing the

---

**6** Deborah Allen told the police during one interview that this incident occurred on September 27 and in a later interview that it occurred on September 28. Johnson testified it occurred on September 28.

9

gun at Hickey, Proby followed him to the restaurant's office. Ronald Lee lay on the floor just outside the office doorway. The other employees were in the stock room just past the office. A second man, whom Hickey described as being about six feet two inches tall and weighing 185 to 200 pounds, was standing against a salad preparation table just outside the office and holding what appeared to be a small semiautomatic handgun. Although Hickey deliberately refrained from looking at the second man's face in order to avoid giving the impression he was looking for identifying features, he perceived that the second man's physical characteristics were consistent with defendant's. While Hickey was opening the safe, the second man told him three times to hurry up, in an unnaturally low voice, as if he were trying to sound gruff. After opening the safe, Hickey left the office and lay on the floor facing the back of the restaurant, where the employees were. The second robber put his foot on Hickey's head to stop him from looking at the employees. Hickey heard cash drawers being removed from the safe. The second robber reached into Hickey's back pocket, removed his wallet, and after a few seconds placed it on Hickey's back. After two or three minutes, Hickey heard the robbers leave the restaurant. After about two more minutes, Hickey got up, checked on the other employees, and called the police. Singh and Williams got up, but Lee still lay on the floor. Hickey then noticed that Lee had a wound on the back of his head. An ambulance later came to take Lee away.

Hickey ascertained that the robbers had taken about $550 in cash and a steel box containing some gift certificates.

After the robbery, about 11:30 p.m., defendant and Proby went to Ulanda Johnson's house, where Johnson noticed defendant was wearing his black backpack on his right shoulder. The next morning, the backpack, containing a gun, was on Johnson's living room floor.

10

Also late in the evening after the robbery, defendant and Proby went to Vera Penilton's house, entered her bedroom, and shut the door. Penilton stood outside the door, listening to their conversation. She heard Proby talking about how they had robbed another McDonald's, and heard defendant say he had killed his friend. Penilton entered the bedroom, and defendant told her he had shot his friend in the back of the head because the boy had said his name. In defendant's backpack were a metal box containing gift certificates and some rolls of coins.

On September 29, the day after the Florin Road robbery murder, defendant made a deposit of $212, consisting of $5 and $1 bills, into his share account at the Safe Federal Credit Union. Less than 20 minutes later, Proby opened an account at the same credit union.

Later that day, defendant and Penilton were riding in Proby's car while Proby drove. A police car with flashing lights came up behind them, and officers inside tried to get Proby to stop. At defendant's urging, Proby continued to drive, running several red lights. Finally, having driven into the parking lot at Ulanda Johnson's apartment building, defendant and Proby jumped out of the moving car, which crashed into a police car and came to a stop. Defendant and Proby were arrested.

Penilton was taken to the police station and interviewed. Initially, she testified, she did not tell the officers the whole truth because she was afraid. She did, however, tell them about the conversation she had overheard between defendant and Proby in her bedroom and that defendant had told her he had killed a boy. Penilton allowed the officers to search her room. They seized money, gift certificates, and the metal box. During a second search, officers seized the phone defendant had taken in the Watt Avenue robbery. Penilton agreed to speak with the officers a second time because she felt bad she had not previously told them

11

the truth.  During the second interview, she told them what she knew about the robberies.

The cause of Lee's death was determined to be a wound to the back right side of his head from a copper-jacketed .25-caliber ACP bullet designed to operate in a semiautomatic weapon.  A live cartridge of the same type of ammunition was recovered from Zaharko's truck.

### b.  Defense case

Pravinesh Singh was cleaning the kitchen at the time of the robbery and saw only one of the robbers, whom he described as being a dark-complected African-American male about five feet eight inches tall, wearing black clothing and a green ski mask.  The robber, who Singh testified was not defendant, held a small silver handgun with which he motioned nervously to Singh to get onto the floor.  Singh complied, lying facedown toward a storage room and away from the robber.  Singh saw Ronald Lee walking toward the safe and standing near the office door.  Singh heard a voice coming from the office, angrily demanding the safe be opened, and then heard a gunshot and a "dropping" sound, like someone falling down.  He did not hear Lee say anything to the robber.

## B.  Discussion

### 1.  Jury Selection Issues

#### a.  Asserted *Batson/Wheeler* error

Defendant contends the judgment must be reversed because the prosecutor peremptorily challenged a prospective juror on the basis of race and the trial court erred in overruling defendant's objection to the challenge, in violation of defendant's constitutional rights to a trial by a jury drawn from a representative cross-section of the community, to equal protection of the law, and to a fundamentally fair and reliable trial.  (*Batson v. Kentucky* (1986) 476 U.S. 79, 89;

12

*People v. Wheeler* (1978) 22 Cal.3d 258, 276-277.)[7]  For the reasons that follow, we disagree.

" 'Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 936.)  Recently, "the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made.  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citations.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."  [Citation.]' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 66-67; see also *People v. Mills* (2010) 48 Cal.4th 158, 173.)

" ' "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  [Citation.]  [¶] In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, "the trial court 'must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised

---

[7]  Although at trial defendant cited only *Wheeler* in support of his objection, this sufficed to preserve his *Batson* claim for appeal.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

13

challenges for cause or peremptorily . . . ." [Citation.]' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " (*People v. Stanley*, *supra*, 39 Cal.4th at p. 936.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613-614.)

Defendant's contention relates to the excusal of M.H, an African-American male prospective juror. In response to defendant's objection to the prosecutor's challenge to M.H., the trial court asked the prosecutor to state his reasons for the challenge on the record, impliedly finding defendant had made a prima facie showing of discrimination.[8] (*People v. Fuentes* (1991) 54 Cal.3d 707, 716.) Turning first to M.H.'s questionnaire responses, the prosecutor explained he challenged M.H. because M.H. wrote that the O.J. Simpson trial "restore[d]" his

---

[8]     At the same time, defendant objected to the prosecutor's challenge to another African-American prospective juror, B.H. After reviewing B.H.'s jury questionnaire, the trial court stated it was satisfied B.H. was not excused on the basis of race, and defendant does not challenge that ruling here.

"faith" in the justice system, whereas the prosecutor believed the Simpson trial was a "travesty." The prosecutor also was concerned that M.H. "disagreed strongly" with the proposition that if the prosecution brings someone to trial, that person is probably guilty; the prosecutor reasoned he could "live with" a juror who "disagreed somewhat" with that proposition, but a response as extreme as M.H.'s was problematic, in the prosecutor's view. The prosecutor also noted that M.H. believed it was better to let some guilty people go free rather than risk convicting an innocent person, whereas the prosecutor preferred a jury composed of people "oriented the other way." The prosecutor cited M.H.'s views on the death penalty, specifically his statement (as paraphrased by the prosecutor) that he would only impose it if he were required to do so; because a death sentence is never mandatory, the prosecutor reasoned M.H. would not impose it: "And he is of the frame of mind, I feel someone is going to have to force him or require him to do it, and I don't believe on this type of a decision I want someone with that frame of mind, because it is a major decision in someone's life, and I think they have to feel comfortable about it, and I don't feel he felt comfortable about it." Finally, the prosecutor cited M.H.'s questionnaire response that he originally felt the death penalty was imposed unfairly against African-Americans, and now was unsure; the prosecutor "didn't feel that he would have the strength to [impose the death penalty], even if he felt that it was right." The trial court denied the motion without comment.

Defendant argues the trial court failed to make a sincere and reasoned attempt to evaluate the prosecutor's stated reasons for the excusal. As noted, the trial court is not required to explain on the record its ruling on a *Batson/Wheeler* motion. (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 919.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v.*

15

*Silva* (2001) 25 Cal.4th 345, 386.) Citing *Silva*, at page 385, defendant contends such an explanation was necessary in this case because the record contradicts the prosecutor's stated reasons for the challenge. To the contrary, we believe a fair reading of the record supports those reasons, along with the trial court's ruling.

Of the reasons the prosecutor gave for excusing M.H., defendant here focuses primarily on one: the prosecutor's assertion that M.H. said he would impose the death penalty only if required to do so. Defendant argues that, contrary to the prosecutor's explanation, M.H. did not indicate he would impose the death penalty *only* if required to do so, but rather said, "if I were required to impose it I would," after a fair trial. M.H.'s entire response to the relevant question asking him to briefly describe his opinions on the death penalty was that the "death penalty should only be applied under certain circumstances, only after fair trail [*sic*] if I were required to impose it I would." This answer is reasonably susceptible of the interpretation the prosecutor placed on it. As the Attorney General argues, M.H. identified only two circumstances in which he would vote for death: after a fair trial and if he were required to do so. Defendant's trial presumably would be fair, but in no event would M.H. be required to vote for the death penalty. The prosecutor therefore could reasonably be concerned that M.H. would not be a favorable juror for the prosecution. "[A] prospective juror's scruples regarding the death penalty 'are reasonably related to trial strategy [citation] and are a legitimate race-neutral reason for exercising a peremptory challenge.' " (*People v. Cowan* (2010) 50 Cal.4th 401, 448-449.) That M.H. stated on voir dire that he could consider both penalties, and thus demonstrated he was not subject to removal for cause (see *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [a juror in a capital case may be excused if his or her views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' "]), did not preclude the prosecutor from exercising a

16

peremptory challenge when M.H.'s questionnaire responses indicated a degree of reluctance to impose the death penalty with which the prosecutor was uncomfortable. (See *Cowan*, at pp. 448-451 [discussing prospective jurors' oral and written comments in upholding excusals]; *People v. Semien* (2008) 162 Cal.App.4th 701, 708.)[9]

The prosecutor's interpretation of M.H.'s response to the question seeking his views on the death penalty, moreover, must be understood in light of his responses to questions No. 80 and 90.b, where he espoused, respectively, the views that the criminal justice system treats some individuals unfairly based on race and that, in the past and possibly in the present day, the death penalty has been imposed unfairly against members of minority groups. Given M.H.'s expressed concerns regarding the fairness of the criminal justice system, together with his statement that he could return a death verdict only after a "fair trial," the prosecutor could reasonably have concluded that M.H. would be an unfavorable juror from the prosecution's standpoint.

Defendant contends a comparative analysis of the questionnaire responses given by Juror No. 7 demonstrates that the prosecutor's stated reasons for excusing M.H. were mere pretexts for racial discrimination, in that Juror No. 7, a White juror whom the prosecutor did not challenge, gave responses similar to those given by M.H. We grant defendant's request that we conduct such an analysis, even though he failed to make the corresponding argument below. (See

---

[9]     The prosecutor asserted he had excused other prospective jurors who expressed their views on the death penalty in similar terms. Defendant claims the assertion was false. As the Attorney General observes, however, the prosecutor in fact challenged for cause two prospective jurors who said they could not impose the death penalty.

*People v. Lenix*, *supra*, 44 Cal.4th at p. 607.)  We disagree, however, that it dictates a finding of *Batson/Wheeler* error in this case.

Defendant first contends that both M.H. and Juror No. 7 expressed similar views of the O.J. Simpson trial, which the prosecutor cited in M.H.'s case as a basis for excusal.  Not so.  In response to question No. 65.b ("How, if at all, did the O.J. Simpson trial affect your view of the courts and the criminal justice system?"), M.H. stated the Simpson trial "restored" his "faith."  Juror No. 7's answer to the same question was:  "It raised my concerns on jury selection and impact of televising a trial."  In response to question No. 64 ("During the past year, have you followed newspaper or television reports for any particular criminal case?" and "What opinions, if any, did you form about the criminal justice system as a result?"), Juror No. 7 reported following the O.J. Simpson and "Terry McVie"[10] cases and observed, "The court system still works."  In response to the same question, M.H. denied following media reports for any particular court case.  Plainly, Juror No. 7's response to the question specifically dealing with the Simpson case was dissimilar to M.H.'s, and his response to the more general question about recent criminal cases did not necessarily constitute an endorsement of the result in the Simpson case.

Defendant correctly points out that, in their questionnaires, both M.H. and Juror No. 7 "disagreed strongly" that if the prosecution brings someone to trial, that person is probably guilty, and that Juror No. 7 agreed even more strongly than

---

**10**     *Sic*, evidently Timothy McVeigh, who, at the time of jury selection in this case, had recently been tried and sentenced to death for the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, which caused the deaths of 168 people, including 19 young children.  McVeigh's coconspirator was Terry Nichols.  (See *U.S. v. McVeigh* (10th Cir. 1998) 153 F.3d 1166, 1176-1177.)

18

M.H. with the proposition that it is better for society to let some guilty people go free than risk convicting an innocent person. As defendant further observes, M.H. and Juror No. 7 shared certain personal characteristics, including academic background, occupation, place of residence, and a preference for science fiction movies. But the two men differed significantly in age and life experience: Juror No. 7 was 51 years old, had been in the military, had a spouse who was employed, and had raised a child to adulthood. He was a supervisor at his place of employment, with the power to hire and fire. M.H. was 34 years old, with a spouse who was not employed and an infant child; he had no supervisory experience or responsibility. The prosecutor reasonably could have taken such life experiences into account in selecting jurors. Juror No. 7's daughter had worked in a fast-food restaurant (such as the scenes of the crimes here) and another relative had been the victim of a crime, which might have tended to make him more sympathetic to the prosecution in this case; M.H. had no relatives with fast-food experience and knew no one who had been victimized.

With respect to views concerning the death penalty, which evidently was a topic of primary importance to the prosecutor, the questionnaires of the two men revealed differences the prosecutor could have found significant: M.H. expressed uncertainty whether the death penalty is imposed too often and whether it is imposed unfairly against African-Americans or any minority group; Juror No. 7 believed the death penalty is imposed neither too seldom nor too often, but "About right," and expressed no uncertainty whether it is imposed unfairly against minorities.

In sum, significant differences in life experiences and attitudes concerning the death penalty existed between M.H. and Juror No. 7, differences the prosecutor could reasonably have taken into account in deciding to peremptorily challenge M.H. and not to challenge Juror No. 7. Defendant's argument therefore fails.

19

## b. Excusals based on views concerning the death penalty

Defendant contends the trial court erred by excusing Prospective Juror O.A. due to her expressed views concerning the death penalty, thereby violating his right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. "The high court has established the legal standard for excusing jurors due to their views on the death penalty, first in *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and then in *Wainwright v. Witt*[, *supra*,] 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. In *Witt*, the Supreme Court explained that a prospective juror may be excused in a capital case if 'the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Id*. at p. 424.) We apply the same standard under the state Constitution." (*People v. Gray* (2005) 37 Cal.4th 168, 192.)

" 'There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' [Citation.] 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.] "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his

20

true state of mind is binding on an appellate court." ' " (*People v. Gray, supra*, 37 Cal.4th at pp. 192-193.)

In her questionnaire, when she was asked to describe her opinions about the death penalty, O.A. wrote: "I could not agree on a death penalty. I could agree with life in prison." She indicated she felt the death penalty was imposed "Too often," that it served no purpose, and there was no type of case in which she thought it ought to be imposed. She indicated she would automatically refuse to vote for the death penalty and that she would automatically always vote for life in prison without the possibility of parole.

Her answers during individual voir dire were less certain than those expressed in her questionnaire, but nonetheless expressed at least a distinct predisposition to favor life over death. In response to the trial court's question whether or not she could consider both penalties, she responded: "No, I don't think that I can." When the trial court immediately followed this answer by inquiring if she was predisposed to one penalty, O.A. stated: "Yes. [¶] . . . [¶] Life imprisonment."

In response to further questioning by the trial court, however, O.A. indicated she thought she "would probably follow the court's instructions." In response to the trial court's question whether, after she had heard all the evidence, arguments, and court's instructions she concluded death was the appropriate penalty, she would vote for death, she stated: "Probably. I think so, yes." O.A. then explained, "I think [the] reason I am hedging more is because I feel that— I would have a difficult time doing it, but I would follow the court's instruction." After the trial court again asked "if you felt that [death] would be the appropriate penalty, despite it being difficult and despite maybe you not liking it, you would vote [for] the death penalty, is that true, ma'am?" O.A. responded, "Yes. [¶] . . . [¶] That's true."

21

After a few additional questions from the prosecutor and the trial court, O.A. explained that, based on her personal beliefs, which derived in part from religion, she believed the death penalty was "not right" and that therefore she could not make the decision to impose death. Defense counsel did not ask O.A. any questions. The prosecutor challenged O.A. for cause, defense counsel submitted the matter without argument, and the trial court excused her. In light of O.A.'s answers to the jury questionnaire, as well as her equivocal answers on voir dire, we defer to the trial court's implicit determination regarding her state of mind and conclude substantial evidence supports the court's ruling the juror's views on the death penalty would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.' " (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424; *People v. Wilson* (2008) 44 Cal.4th 758, 779.)

Defendant next contends the trial court applied disparate standards in evaluating "pro-life" Prospective Juror O.A. and "pro-death" Prospective Juror B.S., claiming B.S. "testified unequivocally that he believed the death penalty should be 'automatically' imposed on anyone who intentionally killed another person." This unequal treatment, defendant claims, violated his rights to a fair and impartial jury and to due process.

Defendant's characterization of B.S.'s view on automatic imposition of the death penalty is misleading. B.S. indicated that despite his religious belief in "an eye for an eye," he could set aside that belief and follow the law and the court's instructions. O.A. did not make such a clear statement. Further, unlike O.A., B.S. indicated without equivocation that he could consider and impose both penalties. In light of the clear differences in the expressed views of these two prospective jurors on their ability to impose the death penalty, we reject defendant's claim that the trial court applied disparate standards in evaluating their answers.

22

## 2. *Denial of Severance Motion*

On July 7, 1997, shortly before trial began, defendant moved to sever the Watt Avenue charges from the Florin Road charges. Although he conceded all of the alleged offenses were of the same class, and hence permissibly joined under section 954, he argued the evidence of each set of offenses was inadmissible in the trial of the other, and their joinder would prejudice him while effecting no substantial judicial economy. The trial court denied the motion without comment. On appeal, defendant contends the trial court's ruling constituted error under state law and denied him due process of law. For the reasons discussed below, we conclude the trial court did not abuse its discretion or otherwise violate defendant's rights by denying the severance motion.

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." Because the Watt Avenue and Florin Road charges alleged offenses of the same class, "the statutory requirements for joinder were satisfied," and defendant "can predicate error in denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion." (*People v. Kraft* (2000) 23 Cal.4th 978, 1030; see *People v. Soper* (2009) 45 Cal.4th 759, 773-774.)

" ' " 'The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.] [¶] 'The determination of prejudice is necessarily dependent on

23

the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]" ' " (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1315; see also *People v. Soper*, *supra*, 45 Cal.4th at pp. 774-775.)

"Our determination whether defendant was prejudiced by joinder requires us first to examine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled. (*People v. Bradford*, *supra*, 15 Cal.4th at pp. 1315-1316.) Conversely, however, the absence of cross-admissibility does not, by itself, demonstrate prejudice. (*Id.* at p. 1316.)" (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030.)

Defendant contends none of the evidence of each set of offenses would properly have been admitted in a separate trial of the other set of offenses. Evidence Code section 1101, subdivision (a), he notes, generally prohibits the admission of evidence of a person's conduct on a specific occasion to prove he acted in character on another occasion. Although subdivision (b) of that statute makes evidence of a prior bad act admissible if relevant to prove a fact in issue other than character (such as his motive, identity, opportunity, intent, plan, or

24

knowledge), defendant contends the evidence in this case was not admissible under subdivision (b).

We have said that "[i]n determining whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan, it is useful to distinguish the nature and degree of similarity (between uncharged misconduct and the charged offense) required in order to establish a common design or plan, from the degree of similarity necessary to prove intent or identity. [¶] The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish . . . the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.] [¶] A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [¶] To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [¶] The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403, fn. omitted.)

25

We have also said " '[o]ther-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity "when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." [Citation.]' [Citation.] The inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." (*People v. Miller* (1990) 50 Cal.3d 954, 987.)[11]

Defendant relies on certain language in *Ewoldt* in arguing that the evidence of the Watt Avenue and Florin Road offenses was not cross-admissible. We said in that case: "[I]n most prosecutions for crimes such as burglary and robbery, it is beyond dispute that the charged offense was committed by someone; the primary issue to be determined is whether the defendant was the perpetrator of that crime. Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently distinctive to establish identity) ordinarily would be inadmissible. Although such evidence is relevant to demonstrate that, assuming the defendant was present at the scene of the crime, the defendant engaged in the conduct alleged to constitute the charged offense, if it

---

[11] Defendant contends *People v. Miller*, *supra*, 50 Cal.3d 954, was superseded on this point by *People v. Ewoldt*, *supra*, 7 Cal.4th at page 403. Not so. (See *ibid.* [citing *Miller* with approval]; *People v. Lynch* (2010) 50 Cal.4th 693, 736-737 [same].)

26

is beyond dispute that the alleged crime occurred, such evidence would be merely cumulative and the prejudicial effect of the evidence of uncharged acts would outweigh its probative value." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 406.) Defendant reasons the identity of the perpetrator of the Watt Avenue and Florin Road robberies was the primary issue at trial, and argues the evidence here lacks common features of sufficient distinctiveness to establish his identity as the robber.

We disagree the similarities in the crimes were insufficient to establish identity. Although there may be nothing particularly distinctive about an armed robbery of a McDonald's restaurant at closing time, per se, in this case certain common features of the Watt Avenue and Florin Road robberies before the trial court at the time it made its ruling sufficed to demonstrate defendant's identity as the perpetrator. These included: (1) defendant's contemporaneous or former employment at both restaurants and his consequent knowledge of their layout and operations; (2) the involvement in both robberies of defendant's friend, Proby, who also had worked at one of the restaurants; (3) the perpetrator's use, in both robberies, of a disguised and unnaturally gruff or gravelly voice; (4) the perpetrators' use of scarves to cover the lower portion of their faces in both robberies; (5) the circumstance that defendant was seen with Proby before and after the Florin Road robbery, and after the Watt Avenue robbery; (6) the discovery of items taken in both robberies at the home of Proby's girlfriend, Vera Penilton; (7) the circumstance that the same type of ammunition used to kill Ronald Lee in the Florin Road robbery was found in Stanly Zaharko's truck, which had been taken in the Watt Avenue robbery; and (8) defendant's admissions to witnesses regarding his involvement in both robberies. In the aggregate, these common features support a reasonable inference that defendant committed both sets of offenses. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) The

27

evidence of each robbery therefore would have been cross-admissible in a separate trial of the other, and defendant cannot demonstrate prejudice from the joinder of the two sets of offenses. The trial court did not abuse its discretion in denying defendant's severance motion, and joint trial of the Watt Avenue and Florin Road offenses did not result in fundamental unfairness and did not deprive defendant of due process.

Defendant further contends that, even assuming some evidence of each robbery would have been cross-admissible on the question of identity, the evidence should have been excluded under Evidence Code section 352 and the federal due process guarantee because evidence of the murder of Ronald Lee at the Florin Road restaurant was irrelevant to the Watt Avenue robbery counts. This argument, in essence, merely reframes the contention that the trial court abused its discretion in denying defendant's severance motion and lacks merit for the reasons discussed above.

### 3. *Evidentiary Issues*

#### a. Exclusion of third party culpability evidence

Defendant contends the trial court violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and also erred under state law by improperly forcing him to choose between competing constitutional rights in ruling on the admissibility of proffered evidence of third party culpability.

The proffered evidence fell into two categories. As to the first, defendant moved for admission of a portion of an out-of-court statement by Proby to police concerning the Florin Road crimes. In the statement, while Proby admitted that he and defendant entered the restaurant and committed the robbery and that defendant shot Ronald Lee, Proby also said a man named "Blackie" supplied one of the guns

28

they used and served as the getaway driver. The trial court ruled that if the defense sought to introduce the portion of the statement describing Blackie's involvement, the entirety of the statement, including the portion in which Proby stated he and defendant entered the restaurant and defendant was the shooter, would be admitted. Given the ruling, defendant declined to introduce Proby's statement and no portion of it was admitted at trial.

The second category of evidence concerned Anthony Edwards, Vera Penilton's cousin. The defense sought to introduce Edwards's prior acts of violence, including his convictions for assault with a firearm and spousal abuse. The prosecutor argued that the absence of any direct or circumstantial evidence linking Edwards to the charged crimes rendered the proffered evidence inadmissible. The trial court agreed, denying the defense motion "without prejudice" to the presentation of additional evidence of Edwards's involvement in the crimes. Defendant did not renew his motion, and no evidence of Edwards's prior acts of violence was admitted at trial.

Defendant challenges both rulings on appeal. As will appear, we conclude the trial court's rulings were consistent with applicable evidentiary and constitutional principles.

### i. *Proceedings in the trial court*

Before trial, the prosecutor filed a motion to exclude third party culpability evidence. At a hearing on the issue, the prosecutor objected to the admission into evidence of any references to "Blackie." The court made a preliminary order precluding the defense from bringing up evidence of third party culpability "unless he has a witness that can prove that."

Thereafter, defendant filed a motion to admit third party culpability evidence, supported by an offer of proof. Of particular significance, he offered to

29

prove that in a statement made on October 3, 1994, Proby told law enforcement officers a third person, "Blackie," was involved in the Florin Road robbery murder and that Blackie, a friend of Proby's from the neighborhood whose true identity Vera Penilton would know, supplied a sawed-off rifle and drove the getaway car. Proby also allegedly gave a description of Blackie to police that more closely matched the description of the Florin Road shooter given by two of the percipient witnesses than it did defendant, in that Proby described Blackie as a Black male, thin and dark-complected, five feet nine inches to five feet 10 inches tall, whereas defendant is six feet three inches tall. Defendant further offered to prove that Penilton told a defense investigator she had a cousin named Anthony Renard Edwards, nicknamed "Black Black" due to his dark complexion, and that Edwards would sometimes go places with Proby in Proby's car and had done so several times during the month of the Florin Road offenses. Finally, defendant offered to prove that Edwards, who had been released on parole in Sacramento in July 1994, had an extensive record of assaultive behavior and use of weapons.

The prosecutor argued that if the portion of Proby's statement relating to Blackie's involvement were admitted, then the portion describing defendant's role in the crimes likewise should be admitted. The prosecutor explained that surveillance video footage in the Florin Road robbery murder showed only two robbers, and eyewitnesses spoke of seeing only two robbers; thus, he implied, the jury would be misled if it heard only the part of Proby's statement that described his and Blackie's roles in the offense. The prosecutor also opposed the admission of evidence of Edwards's criminal history, arguing that its dissimilarity to the

30

Florin Road offenses[12] and the absence of any direct or circumstantial evidence linking Edwards to those offenses rendered it irrelevant, and that it constituted improper character evidence under Evidence Code section 1101, subdivision (a).

The trial court denied defendant's motions to limit the use of Proby's statement and to permit evidence of Edwards's violent conduct. Proby asserted his privilege against self-incrimination and did not testify at defendant's trial, and no part of his statement was introduced into evidence.

### ii. Analysis

In *People v. Hall* (1986) 41 Cal.3d 826, this court articulated the standard California courts apply in determining the admissibility of third party culpability evidence. We said: "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in [*People v.*] *Mendez* [(1924) 193 Cal. 39, 51], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Id.* at p. 833.)

---

**12** The prosecutor represented that Edwards's rap sheet reflected no convictions for robbery or for using a firearm in any incident. Although Edwards had suffered convictions for assault with a deadly weapon (one 1986 misdemeanor, two 1989 misdemeanors, and a 1991 felony) and for spousal abuse, the prosecutor argued nothing suggested that any of Edwards's past offenses shared any similarities with the crimes charged in this case.

31

Nothing in Proby's statement, considered as a whole, tended to raise a reasonable doubt about defendant's guilt. Proby told the police that he and defendant went into the Florin Road McDonald's to commit robbery and that defendant shot the victim. The circumstance that, according to Proby's statement, another person also played a role in the crime by supplying a gun and waiting for defendant and Proby in the getaway car in no way negated or diminished defendant's culpability as the actual shooter.

We may properly look at Proby's statement as a whole because, as the trial court concluded, the prosecution was entitled under Evidence Code section 356 to introduce the portion of the statement describing defendant's participation in the offense if the defense introduced the portion describing Blackie's participation.[13] "The purpose of [Evidence Code section 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156.) Here, in view of the eyewitness and surveillance footage evidence suggesting two men committed the Florin Road robbery, for defendant to introduce the portion of Proby's statement mentioning only Proby and Blackie would have conveyed the misleading impression that only Proby and Blackie participated in the robbery, when Proby actually told the detective that defendant too participated. This case exemplifies the policy underlying the code section. Defendant wanted to rely on a part of Proby's statement to imply that Blackie was

---

[13]    Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

the shooter, which was contrary to what Proby actually said elsewhere in his statement. The rule of completeness exists to prevent such a misuse of evidence. The trial court therefore correctly concluded that Evidence Code section 356 permitted the prosecution to introduce other portions of Proby's statement making that fact clear.

Application of Evidence Code section 356 hinges on the requirement that the two portions of a statement be "on the same subject." As he did at trial, defendant contends that section 356 is inapplicable because the portion of Proby's statement addressing Blackie's role in the Florin Road crimes constituted a different subject than defendant's own role in those same crimes. We are unpersuaded. " 'In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 959.) As the Attorney General argues, both portions of the statement were part of Proby's description of what happened during the Florin Road robbery murder, including who was involved in the offenses and what each person's role was that night, and the introduction of one portion without the other would have left a misleading impression in jurors' minds.

Nor, as defendant argues, would the confrontation clause of the Sixth Amendment to the United States Constitution have precluded the admission, under the hearsay exception embodied in Evidence Code section 356, of the portion of Proby's statement that implicated defendant. In interpreting the requirements of the confrontation clause, the United States Supreme Court in *Crawford* recognized the continuing validity of exceptions, like the rule of forfeiture by wrongdoing, that derive from equitable considerations rather than an improper judicial determination of reliability. (*Crawford v. Washington* (2004) 541 U.S. 36, 62.) "The *Roberts* test [*Ohio v. Roberts* (1980) 448 U.S. 56, 66, overruled in *Crawford*] allows a jury to hear evidence, untested by the adversary process, based on a mere

33

judicial determination of reliability.  It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one.  In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability.  For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability." (*Crawford*, at p. 62.)  We conclude the rule of completeness also falls within this category.

Other courts have reached the same conclusion.  In *People v. Parrish* (2007) 152 Cal.App.4th 263, for example, the Court of Appeal rejected a similar confrontation clause argument in upholding, under Evidence Code section 356, the admission of certain portions of an accomplice's out-of-court statement to police implicating the defendant after the defendant introduced other portions of the same statement. (*Parrish*, at pp. 271-276.)  The *Parrish* court reasoned:  "*Crawford* did not renounce all exceptions to the confrontation clause, only those that replace the constitutionally prescribed method of assessing reliability—cross-examination— with a judicial determination of reliability . . . ." (*Id*. at p. 272.)  *Parrish* "conclud[ed], by analogy to the rule of forfeiture by wrongdoing, that statements otherwise admissible under [Evidence Code] section 356 are generally not made inadmissible by *Crawford*.  This is because, like forfeiture by wrongdoing, section 356 is not an exception to the hearsay rule that purports to assess the reliability of testimony.  The statute is founded on the equitable notion that a party who elects to introduce a part of a conversation is precluded from objecting on confrontation clause grounds to introduction by the opposing party of other parts of the conversation which are necessary to make the entirety of the conversation understood. . . .  As *Crawford* forbids only the admissibility of evidence under statutes purporting to substitute another method for [the] confrontation clause test

34

of reliability, evidence admissible under section 356 does not offend *Crawford*." (*Parrish*, at pp. 272-273; see also *State v. Prasertphong* (2005) 210 Ariz. 496 [114 P.3d 828, 834]; *State v. Selalla* (2008) 2008 S.D. 3 [744 N.W.2d 802, 818] [a defendant may not seek to use the hearsay exception for declarations against penal interest as a shield, to introduce exculpatory parts of an unavailable declarant's statement, while simultaneously using the confrontation clause as a sword to exclude the parts that inculpate the defendant]; *U.S. v. Moussaoui* (4th Cir. 2004) 382 F.3d 453, 481-482.)

We find unavailing defendant's efforts to analogize this case to the *Bruton-Richardson-Gray* line of cases.[14]  Here, unlike in those cases, the prosecution did not initially seek to introduce the portion of the statement implicating defendant, but only sought to use it to correct what would have been an inevitably misleading implication that Proby and Blackie, not defendant, were the two Florin Road robbers, once defendant announced his intention to introduce the "Blackie" portion of the statement.  Nothing in the *Bruton-Richardson-Gray* line of cases speaks to this situation.

---

[14]  See *Bruton v. United States* (1968) 391 U.S. 123, 135-136 (a nontestifying codefendant's extrajudicial statement incriminating a defendant, which when admitted against the codefendant is inadmissible hearsay as to the defendant, is so prejudicial that limiting instructions are deemed ineffective); *Richardson v. Marsh* (1987) 481 U.S. 200, 211 (the admission of a nontestifying codefendant's confession against the codefendant does not violate the defendant's confrontation right if the confession is redacted to eliminate not only the defendant's name but any reference to his existence); *Gray v. Maryland* (1998) 523 U.S. 185, 188, 192 (redactions that simply replace a name with a blank space, a word such as "deleted," a symbol, or other obvious indication of alteration leave statements that so closely resemble the unredacted statements prohibited by *Bruton* as to fall within the same class).

Defendant further asserts that, even if the portions of Proby's statement incriminating him were admissible under Evidence Code section 356, they nevertheless should have been excluded under Evidence Code section 352 because it would be an abuse of the trial court's discretion to admit out-of-court statements incriminating a criminal defendant in derogation of the basic right of cross-examination. Defendant did not make this argument below, but even assuming he had preserved it for appeal, it lacks merit. As we have explained, the trial court's ruling did not abridge defendant's confrontation right, and fairness is served, not thwarted, by the admission of portions of a statement needed to make other portions not misleading. Defendant's argument, moreover, misapprehends the scope of the trial court's authority under Evidence Code section 352. That provision permits the exclusion of relevant evidence in certain limited circumstances; it does not confer plenary authority to exclude the parts of a relevant statement that are inconvenient for the defense.

Defendant also contends that the portion of Proby's statement incriminating Blackie was admissible as a matter of federal due process by analogy to *Chambers v. Mississippi* (1973) 410 U.S. 284. In that case, the defendant sought to present evidence that a third party, McDonald, had confessed to several other persons that he had committed the crime of which the defendant was accused. When the defendant called McDonald as a witness, he repudiated his earlier confession, and Mississippi's rules of evidence precluded the defendant from cross-examining him with the confession or presenting witnesses who would have discredited McDonald's repudiation and demonstrated his complicity in the crime. (*Id.* at pp. 291-294.) The United States Supreme Court held that due process requires state courts to admit reliable evidence that is critical to the defense in criminal cases. (*Id.* at p. 302.) Here, of course, assuming Proby's statement concerning Blackie was reliable, defendant was not precluded from presenting it. Rather,

36

defendant elected not to introduce it in the face of the trial court's ruling, which we have concluded was proper, that if he did so, the prosecution would be entitled to introduce other portions of the statement that incriminated defendant.

Lastly, defendant argues the trial court erred in excluding evidence of Anthony Edwards's convictions and prior assaultive conduct. Defendant acknowledges this court's holding, in *People v. Lewis* (2001) 26 Cal.4th 334, 373, that evidence of an individual's prior acts of violence, without more, shows only criminal propensity and is inadmissible to establish third party culpability. (See Evid. Code, § 1101, subd. (a) [character evidence is inadmissible to prove a person's conduct on a specific occasion].) Defendant argues, however, that the evidence of Edwards's convictions and prior acts of violence should be taken in the context of his offer of proof and that the evidence demonstrates more than mere criminal propensity. But no evidence of substance in this record connects Edwards to the charged offenses. The rule in *Lewis* therefore applies, and defendant's contention must be rejected.

### b. Admission of statement attributed to defendant by prosecution witness Sonya Williams

Defendant contends the trial court abused its discretion under Evidence Code section 352 and violated his rights under the United States Constitution by admitting, over a defense objection, excerpts from a videotape containing statements that prosecution witness Sonya Williams attributed to defendant concerning his role in the Watt Avenue robbery.

The issue arose in the following context: Williams (who, the trial court observed, did not "appear to be a particularly friendly witness [for] the People") testified that defendant had informed her, in advance, of his plan to rob the Watt Avenue McDonald's where he worked. After the robbery, Williams testified, defendant told her he had done what he previously said he was going to do

(alluding to the robbery), showed her a gun and cash, and thereafter said nothing further about the robbery or his role in it.  To rebut the assertion that defendant had said nothing more about the robbery, the prosecutor sought to play excerpts of a tape-recorded interview of Williams by Detectives Minter and Cabrera in which Williams described other details of the robbery that defendant had recounted to her.  Among those excerpts, the prosecutor sought to play the portion of the interview in which Williams told the detectives how she had asked defendant (about the people he had forced into the freezer), "What if they would have died?" and defendant had responded, "They just would have died."  Defense counsel objected on the grounds of improper impeachment, lack of relevance, and Evidence Code section 352.  After a hearing outside the presence of the jury, the trial court overruled the objection, and the excerpt was played for the jury.

On appeal, defendant contends the trial court abused its discretion in admitting the interview excerpts.  He argues the evidence had no probative value for impeachment purposes because Williams had not testified to anything she had discussed with defendant concerning leaving people in the freezer.  He also asserts, contrary to the prosecutor's argument at trial, that the evidence was irrelevant to show defendant's intent in falsely imprisoning the victims, because only the perpetrator's identity, not his intent, was at issue.  Finally, he contends, the evidence tended uniquely to evoke an emotional bias against him and thus was unduly prejudicial under Evidence Code section 352.

We agree with defendant that he has preserved the issue, including its due process aspects, for review.[15] We disagree, however, that the trial court abused its discretion in admitting the evidence.

Contrary to defendant's argument, the evidence possessed probative value as a means of impeaching Williams's repeated assertions that defendant failed to reveal to her any of the details of the robbery. In turn, the presentation of defendant's statements to Williams regarding the details of the crime bolstered the other evidence establishing his identity as the robber. The evidence also was relevant to the false imprisonment charge because it showed defendant's knowledge that his actions had violated the victims' liberty. (§§ 236 [false imprisonment is the unlawful violation of the personal liberty of another], 237, subd. (a) [false imprisonment that is effected by violence, menace, fraud, or deceit is a felony].) Even if defendant focused his efforts at trial on disputing his identity as the perpetrator, the prosecution was required to prove its case, including the intent elements of the charged crimes. (*People v. Moon* (2005) 37 Cal.4th 1, 28.) The probative value of the evidence thus was substantial, and the trial court acted within its discretion in concluding such value outweighed the possibility of undue prejudice stemming from admission of the statement. In any event, even were we to conclude otherwise, reversal would not be required in view of the overwhelming evidence of defendant's guilt of the Watt Avenue crimes. Given the testimony of Stanly Zaharko, Michael Baumann, and Leticia Aguilar describing how defendant had forced them at gunpoint to enter the freezer and

---

[15] Before trial, defendant sought, the prosecution did not oppose, and the trial court made an order that "all defense counsel's objections at trial be deemed objections under the Constitutions of both the State of California and the United States."

locked them inside, the admission of defendant's callous statement to Sonya Williams could not, by any standard, have affected the verdict.[16]

### c. Admission of a letter from defendant to prosecution witness Sean Gilbert

Defendant contends the trial court abused its discretion in admitting a letter he wrote to prosecution witness Sean Gilbert[17] while Gilbert was incarcerated in the Sacramento County jail on charges unrelated to those at issue in this case. The letter accused Gilbert of making false statements that tended to inculpate defendant and included several passages in which defendant directly or impliedly threatened Gilbert with violence as a result. Gilbert considered the letter a threat and turned it over to an officer, who gave it to the prosecution. Defense counsel unsuccessfully objected to the admission of the letter under Evidence Code section 352 and because, in his view, the letter did not contain admissions or threats and, hence, lacked relevance. Defendant here renews his challenge to the admission of the letter under state law and on federal due process grounds.[18]

Defendant implicitly acknowledges the general rule that evidence of threats is admissible as showing consciousness of guilt, but in essence claims that his

---

[16]   Defendant argues the admission of the interview excerpts prejudiced him at the penalty phase as well as the guilt phase. Given the totality of the evidence in this case, we disagree.

[17]   Gilbert worked with defendant at the Watt Avenue McDonald's. He testified that, in separate conversations a week or two before the robbery of that restaurant, defendant spoke about how tranquilizer guns would not kill but only knock out a victim, and told Gilbert he possessed a gun (a rifle or a shotgun). Gilbert also testified he saw a .25-caliber semiautomatic handgun at Deon Proby's house. The day after the robbery, Gilbert testified, defendant came to work with a new Walkman and wearing a new Starter jacket.

[18]   See *ante*, at page 39, footnote 15.

letter falls outside the rule because, in accusing Gilbert of lying, it reflects consciousness not of guilt, but of innocence. As decisions of this state have long recognized (e.g., *People v. Chin Hane* (1895) 108 Cal. 597, 603; *People v. Rosoto* (1962) 58 Cal.2d 304, 350; *People v. Pinholster* (1992) 1 Cal.4th 865, 945; *People v. Slocum* (1975) 52 Cal.App.3d 867, 887), a threat made by a defendant against a prospective prosecution witness, with the apparent intention of intimidating the witness, is properly admitted because an accused's efforts to suppress evidence against himself indicate a consciousness of guilt. (*Slocum*, at p. 887.) This principle fully applies in this case, regardless of the circumstance that the letter accused Gilbert of lying instead of acknowledging the veracity of his statement to police. Furthermore, the trial court did not abuse its discretion in concluding the probative value of the letter outweighed any potential for prejudice under Evidence Code section 352.

Defendant also suggests the trial court abused its discretion in admitting the letter because it included a threat against nonwitness Anthony Motley that was irrelevant and constituted improper evidence of a propensity for violence. He further contends the redaction (omitting gang references) misled the jury to think he was "mad as hell" at Gilbert because of Gilbert's statement to police, when in fact the phrase referred to Gilbert's behavior toward one of defendant's girlfriends. Defendant forfeited these contentions by failing to raise them below. Had he preserved them, we would find any error harmless. As to the portion of the letter concerning Motley, the jury would have been aware of the irrelevance of the threat to any issue in this case, and would already have drawn any inferences regarding a propensity for violence on defendant's part from the threat to Gilbert that was properly before the jury. As to the allegedly misleading redaction, the jury already would have inferred, from defendant's threat to beat Gilbert for making a statement to police, that he was angry at Gilbert, and we are confident the

41

exclusion of evidence of an additional basis for that anger, even if error under state law, would not have made a difference in the outcome of the case.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Nor did admission of the letter prejudice defendant's right to a fair trial in violation of the federal due process guarantee.

### d.  Restriction on defendant's attempt to demonstrate that Watt Avenue eyewitnesses identified him as part of a "consensus"

Defendant contends the trial court violated state evidentiary law and his constitutional right to present a defense to the Watt Avenue charges by precluding him from introducing two pieces of evidence that supported his effort to show the eyewitness identifications were unreliable:  (1) evidence that Leticia Aguilar had a conversation with Watt Avenue store manager Lisa Lee in which Lee encouraged Aguilar to identify defendant as the robber, and (2) evidence that before Detective Minter interviewed Michael Baumann, he learned employees were talking among themselves and repeating rumors about the robbery.  Defendant's contention lacks merit.

The two instances of claimed error arose in the following contexts:

(1)  In response to a question asked by defense counsel on direct examination, defense investigator Marilyn Mobert acknowledged she interviewed Watt Avenue McDonald's employee and eyewitness Leticia Aguilar, who told Mobert she had had a conversation with store manager Lisa Lee.  The prosecutor objected on grounds the question was leading and called for hearsay.  When defense counsel asserted he was not offering the testimony for its truth, the prosecutor inquired as to its relevance.  The court then in effect invited defense counsel to establish a foundation for the admission of the testimony, whereupon defense counsel asked Mobert:  "During the—did Ms. Lee tell Ms. Aguilar— according to Ms. Aguilar, did Ms. Lee—."  The prosecutor objected again on

hearsay grounds, and the court sustained the objection. Defense counsel moved on to another topic.

(2) During defense cross-examination of Detective Minter, defense counsel asked Minter whether, during the course of the investigation, he returned to the Watt Avenue restaurant. Minter said he did. Defense counsel asked whether Minter "talked to a lot of people at the McDonald's, a lot of the employees?" Minter agreed he had talked to "several." Defense counsel asked: "And did you learn in your interviews with those people that—the day after the robbery, couple of days after the robbery, I mean, there were rumors flying all over the place, right?" The prosecutor said: "I am going to object to rumors." The court sustained the objection. Defense counsel asked: "People were talking, employees were talking among themselves about what happened?" The prosecutor again objected, the court sustained the objection, and defense counsel moved on to another topic.

Defendant mounts a twofold challenge to the court's rulings. First, he urges that the court erred in sustaining the prosecutor's hearsay objections because the testimony was offered not for the truth of the matters asserted,[19] but rather to show that the eyewitnesses' identifications of defendant as the robber were tainted by suggestions made by manager Lisa Lee or fellow employees. Second, he contends the rulings deprived him of his right, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to a meaningful opportunity to present a defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690; *Washington v. Texas* (1967) 388 U.S. 14, 19.)

---

[19] See Evidence Code, section 1200, subdivision (a) (" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.").

On appeal, we may not reverse a judgment for the erroneous exclusion of evidence unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354.) As the Attorney General observes, defendant made no offer of proof or attempted otherwise to advise the court of the substance and purpose of the testimony he sought to elicit. He thus does not show entitlement to relief. We reach the same conclusion regarding defendant's constitutional claims. The ordinary application of state evidentiary law does not, as a general matter, implicate the United States Constitution. (*People v. Kraft*, *supra*, 23 Cal.4th at pp. 1035-1036.) Here, the trial court's ruling did not foreclose defendant from presenting a defense, but "merely rejected certain evidence concerning the defense." (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1325.) The trial court's rulings, therefore, did not infringe defendant's constitutional rights.

### e. Sufficiency of evidence of kidnapping

Defendant contends his four convictions for kidnapping to commit robbery in connection with the Watt Avenue crimes should be reversed because there was insufficient evidence of asportation. We disagree.

"On appeal, an appellate court deciding whether sufficient evidence supports a verdict must determine whether the record contains substantial evidence—which we repeatedly have described as evidence that is reasonable, credible, and of solid value—from which a reasonable jury could find the accused guilty beyond a reasonable doubt." (*People v. Hovarter*, *supra*, 44 Cal.4th at pp. 996-997, italics omitted; see generally *Jackson v. Virginia* (1979) 443 U.S. 307, 324.) We presume in support of the judgment "the existence of every fact the

44

trier could reasonably deduce from the evidence." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.)

At the time of the crimes,[20] kidnapping for robbery, or aggravated kidnapping, required movement of the victim that (1) was not merely incidental to the commission of the robbery, and (2) substantially increased the risk of harm over and above that necessarily present in the crime of robbery itself. (§ 209, subd. (b); *In re Earley* (1975) 14 Cal.3d 122, 127; *People v. Daniels* (1969) 71 Cal.2d 1119, 1139; cf. *People v. Dominguez* (2006) 39 Cal.4th 1141, 1149-1155 [discussing asportation element of kidnapping for the purpose of rape].) These two elements are not mutually exclusive but are interrelated. (*People v. Rayford* (1994) 9 Cal.4th 1, 12; see also *People v. Martinez*, *supra*, 20 Cal.4th at pp. 232-233.)

With regard to the first prong, the jury considers the "scope and nature" of the movement, which includes the actual distance a victim is moved. (*People v. Martinez*, *supra*, 20 Cal.4th at p. 233; *People v. Rayford*, *supra*, 9 Cal.4th at p. 12; *People v. Daniels*, *supra*, 71 Cal.2d at p. 1131, fn. 5.) There is, however, no minimum distance a defendant must move a victim to satisfy the first prong. (*Daniels*, at pp. 1128-1129; *Rayford*, at p. 12; *Martinez*, at p. 233.)

---

**20** At the time of defendant's crimes, aggravated kidnapping, codified in section 209, subdivision (b), was defined as kidnapping to commit robbery. In 1997, the Legislature revised the statute to define aggravated kidnapping as kidnapping to commit robbery or certain sex offenses, and modified the asportation standard by eliminating the requirement that the movement of the victim "substantially" increase the risk of harm to the victim. (*People v. Martinez* (1999) 20 Cal.4th 225, 232 & fn. 4; § 209, subd. (b)(1); Stats. 1997, ch. 817, § 2, p. 5519.)

" 'The second prong of the *Daniels* test refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.' " (*People v. Martinez*, *supra*, 20 Cal.4th at p. 233, quoting *People v. Rayford*, *supra*, 9 Cal.4th at pp. 13-14.)

Here, the evidence adduced at trial reveals that when defendant first encountered McDonald's manager Stanly Zaharko, he took Zaharko at gunpoint past the front counter area of the closed restaurant, back through the cooking area, until they reached the restaurant's safe. From there, defendant walked Zaharko from the safe into the back of the restaurant, encountering the three other employees. Defendant then instructed the four to head downstairs to the basement.[21] There, defendant ordered them into the freezer, where the temperature was approximately 20 degrees. Once everyone was inside, defendant shut and locked the door. After waiting approximately 10 minutes to allow the robber time to take whatever he wanted and leave, Zaharko used a fire ax located inside the freezer to break through the door. Zaharko estimated defendant forcibly moved him "in the neighborhood of a hundred and fifty feet, two hundred feet," and that the other three employees were moved "about eighty or ninety feet."

---

[21] The interior stairwell was "completely out of sight" of a person ordering food inside the restaurant. An exterior stairwell, which also led down to the basement, was visible at a close distance outside the back of the restaurant.

46

As in *Daniels,* defendant's forcible movement of the victims was limited to movement *inside* the premises of the Watt Avenue McDonald's (*People v. Daniels*, *supra*, 71 Cal.2d at pp. 1126, 1140), but unlike in *Daniels*, the movement here took Zaharko—and ultimately the other victims—from the front of the store, down a hidden stairway, and into a locked freezer. Under these circumstances, we cannot say the "scope and nature" of this movement was "merely incidental" to the commission of the robbery. Additionally, the movement subjected the victims to a substantially increased risk of harm because of the low temperature in the freezer, the decreased likelihood of detection, and the danger inherent in the victims' foreseeable attempts to escape such an environment.

On this record, then, we conclude sufficient evidence of asportation supports defendant's convictions of aggravated kidnapping.

### 4. *Asserted Prosecutorial Misconduct*

#### a. Comment on Baumann's fear of testifying

Defendant contends the prosecutor engaged in misconduct during closing argument by mentioning a fact not in evidence: that prosecution witness Michael Baumann had risked his life by testifying against defendant. As we explain, the contention was forfeited for appellate purposes by defendant's failure to object below, and lacks merit in any event because the jury would have understood that the prosecutor's remark, in context, was a proper comment on Baumann's testimony.

Baumann, who, as noted, was present at the Watt Avenue McDonald's restaurant at the time of the robbery murder, testified that one of his relatives had worked with defendant at the Florin Road McDonald's restaurant. Baumann had refused to identify the relative to the police and while on the witness stand, and confirmed that he was afraid to testify in court because defendant knew where his

47

family lived. The trial court instructed the jury this evidence was offered only to show the witness's state of mind, and not to show that defendant "either directly or indirectly threatened this witness and/or any of his family members." In response to a question by the prosecutor, Baumann acknowledged that defendant had not directly threatened him. The prosecutor asked, "What does it mean to you if you testify against somebody?" Baumann replied, "You could die." Defense counsel objected and asked that the answer be struck. The trial court declined to do so, but again admonished the jury that the testimony was relevant only on the issue of the witness's state of mind. When the prosecutor began to ask another question along the same lines, the trial court sustained the objection and directed the prosecutor to inquire into another topic.

In closing argument, the prosecutor discussed Baumann's apparent fear of testifying and his identification of defendant as the perpetrator of the Florin Road crimes: "He knows what he saw, and he was scared to death to say it and you saw it. Michael Baumann was the one, if you remember before lunch, basically saying I don't know who did it. Sean doesn't know anybody that worked with my relatives at Florin Road, and then after lunch when he realized that this is just not going to work, I have been subpoenaed, I'm here, I'm going to get it out. And he told the truth, and that's what he told Detective Minter, also, because he has to sit here and look at Mr. Vines face-to-face, and he did it. And he is a person of a strong character. [¶] We submit Michael Baumann is somewhat of your quiet hero. He is in a tough jam, but he came up on it. And he said you know what, after lunch he said I saw Sean coming in the side door. I know it was him."

Defense counsel, during closing argument, reminded the jury of the trial court's admonition: "[Y]ou must keep in mind that there is absolutely no evidence and there is no argument from the prosecution and the Court . . . called it an admonishment when we went through this bit, but there is no evidence that Mr.

48

Vines has done anything directly, indirectly or otherwise to cause Mr. Baumann fear of anything. The Court made that very clear to you."

In his rebuttal argument, the prosecutor returned to this topic: "[Defense counsel] talks about Mr. Baumann and his fear and says what did he really have to be afraid of? Just look at his face, look at his anguish. That's why we call people live so you can see them. That's why we don't want hearsay. You can see them, size them up, look at them and you can tell all over his face he is scared to death to sit in front of this man and say these things. [¶] For one thing, he has a pretty good reason to be afraid of him. He put a gun right to his face. That's a real good reason to be afraid of him. *No evidence he directly threatened him. I'm not saying that*, but he put a gun to his face, and he was a squeeze away from killing him. That's good reason to be afraid. And he put him in the freezer, and he knows where his family lives. And he cares about his family, and he doesn't want his family to get hurt." (Italics added.) Moments later in the argument, the prosecutor said: "And when Mike Baumann has to come in here like any other witness, look at this man and put a gun to his head and shot Ron Lee in the back of the head and have to say he is the one, that takes a lot of courage. It would be real easy for him to say I don't know who it was, and he is off the hook. *He puts himself into jeopardy and risk by saying it is him.* He gets nothing out of it." (Italics added.)

Defendant contends the prosecutor's statement, "He [Baumann] puts himself into jeopardy and risk by saying it is him," constituted misconduct. Defendant forfeited this contention by failing to object at trial. (*People v. Abilez* (2007) 41 Cal.4th 472, 493.) Contrary to defendant's assertion on appeal, the prosecutor's remark was not inherently prejudicial, hence defendant's failure to object may not be excused on the ground that to have done so would have been futile. Even were we to overlook this forfeiture and address the merits of the

49

claim, no error occurred. " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' " (*People v. Hill* (1998) 17 Cal.4th 800, 819; see *People v. Stanley*, *supra*, 39 Cal.4th at p. 951; accord, *Abilez*, at p. 494.) The prosecutor here cannot be said to have infected the trial with unfairness or used deceptive or reprehensible methods. Both counsel told the jury—and Baumann acknowledged—that despite Baumann's fear of retaliation, there was no evidence defendant had threatened him or his family, and the court specifically admonished the jury that Baumann's testimony was not offered to show that defendant, directly or indirectly, threatened him. The jury therefore would have understood the challenged remark as referring only to Baumann's state of mind as he testified—that he *believed* he put himself "into jeopardy and risk" by testifying against defendant—and that this circumstance bolstered the credibility of his testimony. Defendant's contention therefore must be rejected.

### b. Asserted presentation of false testimony by Penilton

A prosecutor's presentation of knowingly false testimony (*Mooney v. Holohan* (1935) 294 U.S. 103, 112), or the failure to correct such testimony after it has been elicited (*Napue v. Illinois* (1959) 360 U.S. 264, 265-272), violates a defendant's right to due process of law under the United States Constitution. (See also *People v. Marshall* (1996) 13 Cal.4th 799, 829; *In re Jackson* (1992)

50

3 Cal.4th 578, 595.)  Defendant claims the prosecutor violated these rules when he presented the testimony of Vera Penilton, who denied that separately tried coperpetrator William Deon Proby was the father of any of her children. According to defendant, this assertedly false denial was relevant to Penilton's credibility in that it reflected both her bias arising from her relationship with Proby and her untrustworthiness, as shown by her willingness to commit perjury.  As we explain, no due process violation occurred.

### i. Facts

Sonya Williams, the first prosecution witness at the guilt phase, testified that she met defendant in April 1994 and they became intimately involved sometime thereafter.  Williams testified that sometime in September 1994 defendant telephoned her, told her he was going to meet Proby and Penilton at a hotel, and asked if Williams would "hang out" with them.  She agreed.  Defendant and Penilton thereafter arrived in a car to pick up Williams.  At the time, Williams had never met Proby or Penilton.

In a videotaped interview with police conducted shortly after defendant and Proby were arrested, Williams told detectives that after he picked her up, defendant dropped her and Penilton off and went to pick up Proby from work. During this time, Penilton told Williams "she just had a baby by, um Deon [Proby].  And she thinks [she's] pregnant again . . . ."

At trial, on direct examination, prosecution witness Penilton testified she first met Proby in April 1994, when she was four months pregnant with her first child.  Penilton denied Proby was the father of that child, who was born in August. Later, on redirect examination, Penilton denied Proby was the father of any of her three children.

51

Penilton testified that, several hours after the robbery, she heard defendant admit to killing Ronald Lee.

### ii. Discussion

According to defendant, Penilton's testimony that Proby was not the father of any of her children "was, as the prosecutor well knew, false" because it "was contradicted by a direct admission Penilton made, before Proby was arrested, to another key prosecution witness, Sonya Williams." Defendant claims the circumstances under which Penilton disclosed Proby's paternity to Williams provide substantial assurances of its trustworthiness because it was a freely made statement, and Penilton had no reason to lie and no advantage to gain by falsely representing to Williams that Proby was the father of her newborn. This assertedly leads to the "inescapable conclusion" that Penilton lied when she testified about when she met Proby and that Proby was not the father of her children.

Unlike defendant, we do not find this conclusion inescapable. Mere inconsistencies between a witness's testimony and her prior statements do not prove the falsity of the testimony. (See *People v. Anderson* (1962) 209 Cal.App.2d 598, 600.) On this record, we cannot know whether Penilton lied in her testimony or in her statement to Williams or, indeed, whether it was Williams whose statement was false or mistaken. Defendant therefore fails to establish that the prosecutor presented false testimony or failed to correct such testimony. Accordingly, no due process violation occurred.

### 5. Issues Related to Counsel

#### a. Ineffective assistance of counsel—failure to impeach Penilton

In a contention closely related to the immediately preceding due process claim, defendant asserts he was denied his Sixth Amendment right to the effective

52

assistance of counsel due to trial counsel's failure to impeach Vera Penilton with Sonya Williams's statement to police.**22** Defendant notes that counsel "unquestionably had access to the proof of [Penilton's] prior admission to Sonya Williams that she had just had a baby by Proby, because it was contained in a court exhibit, memorialized in both a videotape and a written transcript, other portions of which came before the jury. Yet . . . trial counsel unaccountably failed to impeach Penilton with her prior statement to Williams."

"The law governing defendant's claim is settled. 'A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] "Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." ' (*People v. Wharton* (1991) 53 Cal.3d 522, 575 [280 Cal.Rptr. 631, 809 P.2d 290], quoting *People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], italics in original.) It is defendant's burden to demonstrate the inadequacy of trial counsel. [Citation.] We have summarized defendant's burden as follows: ' "In order to demonstrate ineffective assistance of counsel, a defendant must first show

---

**22** Elsewhere in his opening brief, defendant advances a general claim of ineffective assistance of counsel based on the assumption that trial counsel's various trial objections failed to preserve his rights under the state and federal Constitutions.

New constitutional arguments that "do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. . . . are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) *Boyer* therefore allows us to reach the merits of defendant's substantive claims of error, making it unnecessary to address the merits of his general ineffective assistance of counsel claim to the extent it implicates the failure to raise the constitutional "gloss" on his claims of error.

53

counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]  Defendant's burden is difficult to carry on direct appeal, as we have observed:  ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) If the record on appeal " ' "sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected,' " and the "claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

As noted above, on this record, we cannot determine whether Penilton was lying when she made her statement to Williams, or when she testified at defendant's trial, or if it was Williams's statement that was false.  Nor does the record reveal why counsel failed to introduce Williams's statement to police to impeach Penilton.  To conclude definitively that counsel was remiss in failing to impeach Penilton would, on this record, be difficult.  But even assuming for the

54

sake of argument that trial counsel rendered deficient performance, defendant's claim would still fail for lack of prejudice.

As defendant acknowledges, although trial counsel did not impeach Penilton with Sonya Williams's statement to police, he undermined Penilton's credibility by relying on evidence of her convictions of six petty thefts. But perhaps more importantly in light of defendant's present complaint, trial counsel elicited from Penilton that she and Proby were boyfriend and girlfriend, that they were "pretty close," that she and Proby shared a bedroom in her house where Proby kept some of his clothes, and that they slept together "every night." In other words, counsel probed her possible motivations for protecting Proby. Given that the jury heard of Penilton's convictions and the extent of her intimate relationship with Proby, and that the evidence of defendant's guilt was strong, we see no reasonable probability that, had trial counsel impeached Penilton on an additional collateral matter, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694.)

### b. Denial of *Marsden* motion

Defendant contends the trial court abused its discretion by failing to grant his motion made pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 to relieve his attorney and appoint new counsel, thereby violating his Sixth Amendment right to the effective assistance of counsel. We disagree.

After the completion of the guilt phase, but before the commencement of the penalty phase, defendant sent a letter to the trial court expressing displeasure with defense counsel for his cross-examination of particular witnesses, and for "not call[ing] 2 witnesses that would've helped me in the [W]att [A]ve[nue] case."

On September 16, 1997, outside the presence of the jury, the trial court inquired into the meaning of the letter. Defense counsel explained that defendant

wished to move for a mistrial based on the "inadequacy" of the proceedings, and asked the court to appoint counsel to investigate defendant's claim. The court denied the defense motion, but decided to treat defendant's letter as a *Marsden* motion and immediately thereafter conducted a *Marsden* hearing.

During the closed hearing, defendant reiterated that his dissatisfaction with defense counsel stemmed from his failure to call two defense witnesses and his failure to ask on cross-examination certain questions of prosecution witnesses. After listening to defendant's complaints, the trial court asked counsel for a response.

Regarding defendant's charge that he had failed to call two witnesses, counsel explained that he had sought out one witness, Jerome Williams,[23] but had not been able to locate and subpoena him. Regarding the second witness, Tina Villanueva, who was to be an alibi witness, counsel explained that had he presented Villanueva, "two things would have been happening. That would have been perjury, which I am not inclined to do for anybody, and the District Attorney had a copy of the letter from [defendant] to . . . Villanueva [in which defendant '[told] her that she was his alibi witness'], and would have buried him even more than he was."

Regarding defendant's charge that counsel failed to cross-examine prosecution witnesses with particular questions, counsel explained, "They were

---

**23**    Jerome Williams was defendant's coworker at the Florin Road McDonald's and an eyewitness to those crimes. Williams was interviewed by Sacramento Police Detective Richard Overton about three hours after the Florin Road crimes. Williams described one of the gunmen as "approximately five foot seven, 140 to 160 pounds." Defendant is six feet three inches tall.

56

issues which I felt at the time were either better left alone or not further explored
. . . ."

After hearing from both defendant and defense counsel, the trial court denied the *Marsden* motion.

" 'Defendants in capital cases often express dissatisfaction with their appointed counsel, affording us ample opportunity to address the contours of the rule set forth in *Marsden*, *supra*, 2 Cal.3d 118. The rule is well settled. " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " [Citation.] The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would "substantially impair" the defendant's right to effective assistance of counsel.' " (*People v. Abilez*, *supra*, 41 Cal.4th at pp. 487-488.)

Here, the record demonstrates the court allowed defendant to explain the reasons for his dissatisfaction with counsel and permitted counsel to respond. Counsel had adequate explanations for all of defendant's complaints, including an unwillingness to suborn perjury by calling Tina Villanueva. (*In re Branch* (1969) 70 Cal.2d 200, 210 [an attorney owes the client no duty to present untruthful testimony]; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1217.) With respect to defendant's complaint that counsel failed to ask particular questions on cross-examination, counsel's explanation at the closed hearing indicates it was a tactical

57

decision to prevent the introduction of or further emphasis on testimony unhelpful or damaging to defendant.  And, with respect to defendant's charge that counsel failed to call Jerome Williams, counsel's reason for not doing so—that he could not locate him—was a sufficient response to defendant's complaint.  Because the record does not clearly show counsel's performance was inadequate, the trial court did not abuse its discretion in refusing to relieve counsel.  (*People v. Abilez*, *supra*, 41 Cal.4th at p. 488.)

Defendant further faults the trial court for failing to conduct a "meaningful inquiry" into the matter because the court "asked not a single follow-up question regarding trial counsel's failure to present Jerome Williams' exculpatory evidence, and completely failed to explore whether this evidence could have been presented."  But contrary to defendant's suggestion, and as the Attorney General correctly notes, the trial court had no way of knowing the exculpatory nature of Williams's statement to police and consequently cannot be faulted for conducting an inadequate inquiry.  First, at the *Marsden* hearing, when Williams's name was initially revealed, trial counsel explained that he had attempted to locate Williams to no avail, a response that was sufficient to end the inquiry immediately.  Second, because a magistrate had presided over defendant's preliminary hearing where the detective testified as to Williams's exculpatory statement—rather than the trial judge hearing defendant's *Marsden* motion—the trial court had no basis to query further into the matter.  Under these circumstances, then, we cannot characterize the trial court's inquiry into defendant's complaint as deficient.

### c. Ineffective assistance of counsel—failure to introduce evidence of Jerome Williams's description of the robber

Defendant asserts trial counsel rendered constitutionally ineffective assistance in failing to introduce evidence of Jerome Williams's description of the Florin Road robber.  Defendant notes:  "Jerome Williams was the Florin Road

58

employee and eyewitness who, in the hours immediately after the robbery-homicide, told a detective that the robber with the silver gun was '*approximately five foot seven, a hundred and forty to one hundred sixty pounds*.' " This description tended to be exculpatory because defendant stands six feet three inches tall. According to defendant, Williams's statement to the detective was admissible under the spontaneous statement exception to the hearsay rule, codified in Evidence Code section 1240, and defense counsel therefore was ineffective for failing to introduce it.

As noted above, in order to demonstrate ineffective assistance of counsel, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Lucas*, *supra*, 12 Cal.4th at p. 436.) We review deferentially counsel's reasonable tactical decisions. (*Ibid.*)

At the threshold, we observe that it was not clear Williams's statements were admissible. At defendant's preliminary hearing, the prosecution called Sacramento Police Detective Richard Overton. On cross-examination by defendant's counsel, Overton testified he interviewed Jerome Williams, one of the Florin Road McDonald's employees, about 1:20 a.m. on September 29, 1994. The robbery had occurred several hours earlier, just before 11:00 p.m. Williams told Overton he had seen a single robber and, as indicated above, described his height and weight as inconsistent with defendant's.

When asked to describe Williams's demeanor during the interview, Overton characterized him as "[u]pset, frightened, sad, concerned."

In arguing that trial counsel was ineffective for failing to introduce Overton's statement, defendant relies first on Evidence Code section 1240, which provides: "Evidence of a statement is not made inadmissible by the hearsay rule if

the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." Defendant also relies on *People v. Brown* (2003) 31 Cal.4th 518, 541, where we addressed that statute and said:  " 'When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity.  [Citations.]  But as we emphasized in *People v. Washington,* "Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*." ' (*People v. Poggi* (1988) 45 Cal.3d 306, 319 [246 Cal.Rptr. 886, 753 P.2d 1082], quoting *People v. Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259], italics added in *Poggi*.)"  We further explained: " ' The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker.  The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. . . .  [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter.' " (*Ibid.*)

Here, the adjectives Overton used in describing Williams's demeanor during the interview—"[u]pset, frightened, sad, concerned"—along with the relatively short period of time that had elapsed between Williams's observation of the robber and his interview with Overton, suggest Williams's statement to Overton may have been admissible under Evidence Code section 1240.  (See, e.g.,

60

*People v. Raley* (1992) 2 Cal.4th 870, 893-894 [a statement made 18 hours after an event was held spontaneous under Evid. Code, § 1240].)

We need not decide whether the statement would have been properly admitted, however, because defendant's claim of ineffective assistance of counsel fails for lack of prejudice. (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020; *Strickland v. Washington*, *supra*, 466 U.S. at p. 697.) Contrary to defendant's argument, ample evidence connected him to the Florin Road crimes. On direct examination, prosecution witness and Florin Road McDonald's manager Jeffrey Hickey positively identified Proby as one of the two gunmen and described Proby as roughly five feet 10½ inches tall. Hickey described the second gunman as weighing between 185 and 200 pounds and as being approximately six feet two inches tall. Hickey also testified that from his experience working with defendant, the physical features of the second gunman, including height, weight, build, skin color, and age, were consistent with those of defendant.

Towards the end of his direct testimony, Hickey stated that the "only difference" he noticed between the second gunman and defendant was that the voice used by the second gunman did not appear to be his natural voice. Earlier in his testimony, Hickey described the second gunman's voice as "gruff" and that he "sounded like he was trying to sound mean to make me hurry up [in opening the restaurant safe], to make me worry."

Although Hickey ultimately failed to positively identify defendant as the second masked gunman, he nevertheless testified that the second gunman's physical features, including his height, weight, build, skin color, and age, were consistent with defendant's. Further, as noted above, prosecution witness Vera Penilton testified that several hours after the robbery, she heard defendant admit to killing Ronald Lee. On this evidence, then, we see no reasonable probability that, had trial counsel introduced Williams's description of one of the gunmen to

61

Detective Overton under Evidence Code section 1240, the result of the proceeding would have been different. (*People v. Lucas*, *supra*, 12 Cal.4th at p. 436.) As a result, we reject defendant's claim that trial counsel was constitutionally ineffective.

### 6. Instructional Issues

#### a. Refusal to instruct that immunized testimony of a prosecution witness should be viewed with distrust

Vera Penilton, the only witness to definitively connect defendant to the Florin Road crimes, testified at trial under a grant of use immunity, and the jury was so informed. Defendant asked the court to instruct the jury to view her testimony with distrust. The court refused to do so, but instead instructed the jury it could consider "anything that has a tendency to prove or disprove the truthfulness of the testimony of the witness," including "[w]hether the witness is testifying under a grant of immunity." Defendant argues the trial court erred in refusing his requested cautionary instruction.

Defendant relies on certain language in *People v. Hunter* (1989) 49 Cal.3d 957 (*Hunter*), but that case does not bear the weight defendant seeks to place on it. In *Hunter*, we rejected the contention that a trial court erred in refusing to give a cautionary instruction where witnesses testified under grants of transactional immunity.[24] *Hunter* began by stating the general rule that, except where additional evidence is required by statute, the direct evidence of one witness who

---

[24] "Use immunity protects a witness only against the actual use of his compelled testimony, as well as the use of evidence derived therefrom. Transactional immunity protects the witness against all later prosecutions relating to matters about which he testifies." (*Hunter*, *supra*, 49 Cal.3d at p. 973, fn. 4; see *Kastigar v. United States* (1972) 406 U.S. 441, 449-453, 460.)

is entitled to full credit is sufficient for proof of any fact.  (Evid. Code, § 411; *Hunter*, at p. 977.)  *Hunter* noted that the Penal Code sets forth certain exceptions in criminal cases, including the corroboration requirement for *accomplice* testimony (§ 1111), but emphasized that no California authority had recognized a similar exception for *immunized* testimony, notwithstanding the existence of a contrary rule in the federal courts (*Hunter*, at p. 977).  *Hunter* did, as defendant observes, distinguish use immunity from transactional immunity in rejecting a requirement of a cautionary instruction.  "Under federal law the prosecutor cannot grant transactional immunity.  [Citations.]  Thus, the government remains free to prosecute the witness after he testifies, as long as the prosecution is not based on the witness's testimony.  The grant of immunity therefore does not totally eliminate the witness's incentive to testify falsely.  [Citation.]  California law, however, provides that a witness ordered to testify over a claim of self-incrimination shall be given transactional immunity.  (§ 1324; *Daly v. Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193]; [citation].)  The prosecution's leverage over the witness is thereby sharply diminished, as is the witness's motive to falsify.  Thus, to paraphrase [*People v.*] *Alcala* [(1984) 36 Cal.3d 604, 623 (rejecting the contention the jury must be instructed to distrust *in-custody informant* testimony)], 'whatever consideration [an immunized witness] may expect for testifying, the direct, compelling motive to lie is absent.' (36 Cal.3d at p. 624.)"  (*Hunter*, at pp. 977-978.)

That *Hunter* held a cautionary instruction is not required when a witness testifies under a grant of *transactional* immunity is clear.  Equally clear, however, is that *Hunter* did not confront the situation before us in this case, involving a witness testifying with *use* immunity, and its remarks concerning the latter situation are therefore dicta.

63

Defendant points out that, since *Hunter*, the Legislature has amended section 1324 to provide for use immunity in addition to transactional immunity. *Hunter*'s discussion of the difference between the two types of immunity, he argues, dictates that a cautionary instruction be given on request when a witness, like Penilton, testifies under a grant of use immunity, which, unlike transactional immunity, does not "totally eliminate the witness's incentive to testify falsely." (*Hunter*, *supra*, 49 Cal.3d at p. 978.) Similar instructions, he notes, are required in connection with the testimony of accomplices (see *People v. Guiuan* (1998) 18 Cal.4th 558) and in-custody informants (§ 1127a). Because a witness who is given only use immunity may still be prosecuted for the underlying crimes, in defendant's view the witness still has a compelling motive to lie, and the jury must be instructed to distrust the witness's testimony.

We are not persuaded. The general rule, of course, is that the jury decides all questions of fact, including the credibility of a witness. (Evid. Code, § 312.) And, as noted, except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact. (Evid. Code, § 411.) A cautionary instruction, by obligating the jury to view with skepticism the testimony of an immunized witness, impinges on the jury's otherwise unfettered power to determine the witness's credibility. To be sure, with respect to narrow categories of evidence, such as the testimony of accomplices, which must be corroborated (§ 1111), and in-custody informants (§ 1127a), the Legislature has imposed limits on the general rules because the witness is deemed to have a particularly compelling motive to lie. The Legislature has not, however, seen fit to do so with respect to immunized testimony, even after *Hunter*. We therefore see no compelling reason to depart from the generally applicable rule that the instructions need not direct the jury to view a particular type of evidence with distrust.

The Court of Appeal, in *People v. Hampton* (1999) 73 Cal.App.4th 710, 721-724, employed similar reasoning in rejecting a claim of error in the refusal to instruct that the testimony of an immunized witness should be viewed with distrust. *Hampton* noted that no authority requires California courts to follow the federal instructional rule and that the difference between the federal and former state statute was but one of the bases on which we rested our decision in *Hunter*, *supra*, 49 Cal.3d 957.[25] (*Hampton*, at p. 723.) Citing an earlier Court of Appeal decision that reached the same conclusion (*People v. Echevarria* (1992) 11 Cal.App.4th 444), *Hampton* recognized " 'the logic behind the concept that an immunized witness's testimony may not be as trustworthy as a nonimmunized witness's testimony,' " but nevertheless concluded " 'it is a better practice to include factors such as immunized testimony to the list of considerations contained in CALJIC No. 2.20 rather than telling the jurors which witnesses they should or should not trust because, as they are specifically instructed, they "are the sole judges of the believability of a witness and the weight to be given the testimony of each witness." ' " (*Hampton*, at p. 723; see also *Echevarria*, at p. 450 ["It is equally logical that a convicted felon's testimony may not be as trustworthy as a nonfelon's, or that a person with an established bias, interest, or other motive, may not be as trustworthy as someone without such interests or motives. All of these factors are 'amplified' within CALJIC No. 2.20, and this trial court's inclusion of an immunized witness's testimony in that list of

---

**25** The witness in *Hampton* testified that she understood her grant of immunity to mean she "could not be prosecuted for whatever she might say in court or for any of these events" (*People v. Hampton*, *supra*, 73 Cal.App.4th at p. 714), arguably describing both use and transactional immunity (*id.* at p. 723). The *Hampton* court reasoned that the rationale of *Hunter*, rather than the federal rule, should apply in either event. (*Hampton*, at p. 723.)

amplifications was entirely appropriate."].)  The trial court did so here and did not err in refusing to instruct the jury to distrust Penilton's testimony.

### b. Challenges to CALJIC Nos. 2.01, 2.21.2, 2.22, 2.27 and 8.83

Defendant contends several standard CALJIC instructions given during the guilt phase of his trial impermissibly diluted the requirement that guilt be proven beyond a reasonable doubt, thereby violating his constitutional rights to due process and trial by jury.  Specifically, defendant takes issue with CALJIC Nos. 2.01 and 8.83, both of which address the sufficiency of circumstantial evidence,[26] as well as CALJIC Nos. 2.21.2 [witness willfully false],[27] 2.22 [weighing conflicting testimony],[28] and 2.27 [sufficiency of testimony of one witness].[29])[30]

---

[26]  As given at defendant's trial, CALJIC No. 2.01, which was virtually identical to the version of CALJIC No. 8.83 also given at defendant's trial, read in part as follows:  "Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt.  [¶] *If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable*."  The language defendant finds objectionable is in italics.

[27]  As given at defendant's trial, CALJIC No. 2.21.2 read as follows, with the language defendant finds objectionable in italics:  "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe *the probability of truth* favors his or her testimony in other particulars."

[28]  As given at defendant's trial, CALJIC No. 2.22 read as follows, with the language defendant finds objectionable in italics:  "You are not bound to decide an issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force.  You may not disregard the testimony of the greater number of witnesses merely from caprice,

*(footnote continued on next page)*

As defendant acknowledges, we have previously considered and rejected the argument that these instructions improperly dilute the constitutional requirement that guilt be proven beyond a reasonable doubt. (*People v. Jennings* (1991) 53 Cal.3d 334, 386 [rejecting the defendant's challenge to CALJIC No. 2.01, noting: "The plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt."]; *People v. Brasure* (2008) 42 Cal.4th 1037, 1058-1059 [rejecting challenges to CALJIC Nos. 2.01, 2.21.2, 2.22, 2.27 & 8.83].)

Defendant advances no persuasive reason to reconsider our prior rejection of challenges to these instructions, and we decline to do so.

### 7. Assertedly Prejudicial "Spillover" Effect of Errors

Defendant contends his convictions for the Watt Avenue crimes should be reversed because of a "spillover" effect from the asserted errors and failures of

---

*(footnote continued from previous page)*

whim or prejudice, or from a desire to favor one side against the other. You must not decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. *The final test* is not in the relative number of witnesses, but *in the convincing force of the evidence*."

[29] As given at defendant's trial, CALJIC No. 2.27 read as follows: "You should give the uncorroborated testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact whose testimony about that fact does not require corroboration is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends."

[30] Despite defendant's failure to object to these instructions, we may consider his challenges to them on appeal. (§ 1259.)

counsel regarding the Florin Road crimes. Because we have determined that no prejudicial error occurred with respect to the Florin Road crimes, we necessarily reject this claim as well.

## II. PENALTY PHASE

### A. Facts

#### 1. *Prosecution Case in Aggravation*

The prosecution presented victim impact testimony, described in further detail below, by relatives of Ronald Lee and the mother of his child. The prosecution also introduced evidence that defendant had previously been convicted of burglary and residential burglary.

#### 2. *Defense Case in Mitigation*

Several of defendant's family members, a friend, and a high school teacher testified on defendant's behalf.

Defendant's uncle, Renee Vines, described him as a jokester and a playful kid who did not display temper. The Watts neighborhood of Los Angeles, where defendant grew up in part, was "one of the roughest areas," and one would have to be streetwise to survive there. Renee Vines considered that for defendant to finish high school and never get into serious trouble in Watts meant "he did a very good job." Kevin Vines, another of defendant's uncles, testified defendant never joined a gang because he "didn't have the heart" and "wasn't cut out for it." Roger Vines, defendant's father, described him as a mild kid who was not a fighter and who was like a big brother to many other children. Once, defendant's jaw was broken by some kids who wanted him to join a gang.

Sonia Evette Pearson, defendant's mother, testified she was 15 years old when defendant was born and that she married Roger Vines when defendant was three or four years old. Their relationship had its ups and downs. Roger would

discipline defendant by beating him, which Sonia disagreed with. Roger treated defendant's sister, Myeisha, more gently and appeared to slight defendant by comparison. When her marriage to Roger ended, Sonia moved with the children to Los Angeles, while Roger stayed in Sacramento. One summer, in the course of a child support dispute, Roger did not return the children after a visit. Lacking the income from his support payments, Sonia was forced to move to an apartment in the housing projects in Watts. Eventually she retrieved the children from Sacramento and they continued to live in the projects until she could afford other housing. The adjustment to their new living situation was difficult for the children, and the projects were dangerous.

Sonia concluded by telling the jury that defendant was not a fighter, he was good with people, especially kids, and he was important to her.

Ann Diver-Stamnes, Ph.D., a professor of secondary teacher education at Humboldt State University at the time of trial, was a teacher at Jordan High School when defendant was a student there. She described the school as rundown, dirty, poorly maintained, and unsafe. Many of the students there, including defendant (and contrary to popular stereotypes), however, were caring and altruistic individuals. She described defendant, who was enrolled in her peer counseling class, as a warm and caring young man with a strong sense of humor who did "stellar" work in her class and was not affiliated with a gang.

### B.  Asserted Error in Admission of Victim Impact Evidence

Defendant contends the trial court erred in admitting, over his objection, a videotape depicting Ronald Lee singing and dancing, activities at which he was accomplished and in which he took great pleasure. Defendant further contends the trial court abused its discretion in permitting four witnesses to testify regarding the impact of Lee's murder on them, although with but one minor exception he made

69

no objection to their testimony at trial.  The asserted errors in admitting this evidence, defendant argues, deprived him of the due process of law.  As we shall explain, the trial court did not abuse its discretion.

Admission of victim impact evidence at the penalty phase of a capital trial is permissible under the Eighth Amendment to the United States Constitution (*Payne v. Tennessee* (1991) 501 U.S. 808), and such evidence is admissible as a circumstance of the offense under section 190.3, factor (a) (*People v. Brown*, *supra*, 31 Cal.4th at p. 573), provided it does not invite a purely irrational response from the jury (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056).  Victim impact evidence is "designed to show . . . each victim's 'uniqueness as an individual human being.' " (*Payne*, at p. 823, italics omitted.)

We have held that courts should be cautious about admitting videotapes featuring the victim, noting that "[p]articularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents. . . .  In order to combat this strong possibility, courts must strictly analyze evidence of this type and, if such evidence is admitted, courts must monitor the jurors' reactions to ensure that the proceedings do not become injected with a legally impermissible level of emotion." (*People v. Prince* (2007) 40 Cal.4th 1179, 1289.)  "The determination whether and to what extent to admit a videotape of the victim's life at the penalty phase of a capital case is within the sound discretion of the trial court." (*People v. Kelly* (2007) 42 Cal.4th 763, 801 (conc. opn. of Werdegar, J.); see also *People v. Brady* (2010) 50 Cal.4th 547, 579 [admission of a brief " 'home movie' " videotape depicting the victim during a family holiday

70

celebration and a family trip did not constitute an abuse of the trial court's discretion].)

In the five-minute videotape, which the trial court viewed before admitting and which we too have viewed, Ronald Lee is seen singing, dancing, and rapping in three musical numbers with relatives, including his cousin Littell Williams, Jr.; in a fourth number, Lee and several other young people perform before a crowd in a high school auditorium. The videotape is of "home movie" quality, without added music, narration or visual techniques, or staged or contrived elements; it is not a tribute or eulogy, and there is nothing particularly dramatic or emotional about the performances. (See *People v. Dykes* (2009) 46 Cal.4th 731, 785.) The videotape depicts Lee at an age only about two years younger than he was at the time of his death at age 20, and thus presumably very nearly as he was when defendant shot him. The depiction of Lee's singing and dancing was relevant to show what he was like. (*People v. Kelly*, *supra*, 42 Cal.4th at p. 798.) We agree with the trial court that the videotape contained "nothing inflammatory that would divert the jury from [its] proper function," and nothing in the record suggests the jury in fact reacted emotionally to the playing of the videotape. We therefore conclude the trial court did not abuse its discretion in admitting it.

Defendant also contends the testimony of the four witnesses—Andrea Clayton, Diane Williams, Littell Williams, Sr., and Littell Williams, Jr.— regarding the effect of Ronald Lee's murder on them exceeded the proper scope of victim impact evidence under state and federal law and was so prejudicial as to require reversal of the death judgment.

Andrea Clayton, the mother of Ronald Lee's child, testified she met Lee when she was 15 years old and, although they were no longer boyfriend and girlfriend at the time of his death, they had agreed to be supportive of each other. At the time of trial, their son was three years old, and Clayton had told him mean

71

people had shot his daddy, who was in heaven with Jesus now. She wondered how their relationship would be and what their family would be like if Lee had lived. She missed Lee's companionship and everything about him.

Diane Williams, Lee's legal guardian and the mother figure in his life, testified Lee was a "joy," a well-mannered, friendly, and helpful boy. She described the shock of learning of Lee's death, the difficulty she had in coming to terms with it, and the emptiness it left in their family.

Littell Williams, Sr., Lee's mother's uncle, knew Lee all his life. Lee was a good, helpful, ambitious young man with a lovely voice. Williams, Sr., missed Lee's presence, particularly at the church they both attended.

Littell Williams, Jr., Lee's cousin, testified he and Lee grew up together and were like brothers. They had a strong bond and did everything together; Williams, Jr., confided in Lee in a way he could not do with anyone else. They had formed a singing group and made a recording under a contract with a Los Angeles company. Williams, Jr., described the shock of learning of Lee's death and his difficulty in accepting it. Lee's death had taken a toll on Williams, Jr., and his family, and holidays were never the same afterward.

As noted, "[u]nless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under section 190.3, factor (a) as a circumstance of the crime. [Citation.] The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair." (*People v. Brady*, *supra*, 50 Cal.4th at p. 574; see also *People v. Burney* (2009) 47 Cal.4th 203, 258.) Here, as in *Burney*, the witnesses' testimony was brief, amounting to fewer than 40 pages of reporter's transcript, and, as far as we can discern from the record, was delivered without excessive emotion. The victim impact evidence in this case was "typical of this type of evidence that we routinely have allowed, and

72

came within the limits established for such evidence." (*Burney*, at p. 258.)  Its admission, therefore, was proper under state law and did not violate defendant's federal constitutional rights.

## C.  Challenges to the Constitutionality of California's Death Penalty Law

### 1.  *Challenge to Prosecutor's Discretion Based on* Bush v. Gore

Defendant argues that the death penalty in California violates the California Constitution and the Eighth and Fourteenth Amendments to the United States Constitution because it is imposed arbitrarily and capriciously depending on the county in which the case is prosecuted.

We have repeatedly rejected substantially similar claims, concluding over 20 years ago that "prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not . . . offend principles of equal protection, due process, or cruel and/or unusual punishment."  (*People v. Keenan* (1988) 46 Cal.3d 478, 505; see also *People v. Demetrulias* (2006) 39 Cal.4th 1, 43.)

Defendant, however, urges this court to reexamine our decisions in prior cases in light of the United States Supreme Court's voting rights decision in *Bush v. Gore* (2000) 531 U.S. 98, which, he asserts, requires uniformity among California's 58 counties for prosecutorial standards for seeking the death penalty.  But as the high court explained, its consideration of the equal protection challenge to Florida's voting recount process was "limited to the present circumstances, for the problem of equal protection in *election processes* generally presents many complexities."  (*Id.* at p. 109, italics added.)  That case, therefore, does not warrant our revisiting our prior holdings on the instant issue.  (*People v. Bennett* (2009) 45 Cal.4th 577, 629, fn. 19.)

## 2. Delay in Appointment of Counsel

Defendant contends the delay in appointing appellate counsel—from the judgment in November 1997 to May 2003—violated his constitutional rights. Specifically, defendant claims a violation of his due process right to a speedy appeal and his right to equal protection.

We previously have considered and rejected identical claims. (*People v. Dunkle* (2005) 36 Cal.4th 861, 942; *People v. Welch* (1999) 20 Cal.4th 701, 775-776; *People v. Holt* (1997) 15 Cal.4th 619, 708-709.) In support of his argument, defendant relies on federal authority in noncapital cases, but as we have explained, "[n]one of those decisions address the unique demands of appellate representation in capital cases." (*Holt*, at p. 709.) Additionally, "defendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants." (*Ibid.*) Defendant has identified no persuasive reason to reconsider our prior holdings, and we decline to do so.

## 3. General Challenges to the Constitutionality of California's Death Penalty Law

Defendant contends that "[m]any features of this state's capital sentencing scheme, alone or in combination with each other, violate the United States Constitution." He concedes we have rejected these claims in previous decisions, but argues we should reconsider them. Having found no reason to do so, we reject these claims and list them here to ensure a future court will consider them fully exhausted. Accordingly, we conclude the death penalty law is not unconstitutional:

— In assertedly failing to "genuinely narrow the class of persons eligible for the death penalty" generally, or more specifically because the special

74

circumstances are so numerous or so broad (*People v. Abilez*, *supra*, 41 Cal.4th at p. 533);

— Due to the asserted overbreadth of section 190.3, factor (a), which permits the jury to consider the circumstances of the crime as an aggravating factor (*People v. Abilez*, *supra*, 41 Cal.4th at p. 533);

— In failing to require the jury to find the aggravating factors were proved beyond a reasonable doubt, that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, or that death is the appropriate penalty beyond a reasonable doubt (*People v. Abilez*, *supra*, 41 Cal.4th at p. 533), nor is this conclusion called into question by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 (*People v. Mills*, *supra*, 48 Cal.4th at p. 214; see also *Cunningham v. California* (2007) 549 U.S. 270);

— In failing to require jury unanimity with respect to aggravating factors (*People v. Abilez*, *supra*, 41 Cal.4th at p. 533);

— In failing to impose a burden of proof on either party, even if only proof by a preponderance of the evidence, or, alternatively, in failing to instruct the jury on the absence of a burden of proof (*People v. Cowan*, *supra*, 50 Cal.4th at p. 509; *People v. Abilez*, *supra*, 41 Cal.4th at p. 533);

— In failing to require the jury to return written findings (*People v. Abilez*, *supra*, 41 Cal.4th at p. 533);

— In failing to require intercase proportionality review (*People v. Abilez*, *supra*, 41 Cal.4th at p. 534);

— In failing to specify which factors are aggravating and which are mitigating (*People v. Abilez*, *supra*, 41 Cal.4th at p. 534);

— In prefacing several factors with the phrase "whether or not" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 534);

75

— In "treating noncapital sentencing differently from capital sentencing (*People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1067 ['The statutory scheme does not deny capital defendants the equal protection of the laws or any other constitutional right insofar as it does not contain disparate sentence review (i.e., comparative or intercase proportionality review)']; *People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614] ['capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law'])" (*People v. Abilez*, *supra*, 41 Cal.4th at pp. 534-535);

— In failing to comply with "International Norms of Humanity and Decency" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 535); and

— In light of the abolition of capital punishment in Western Europe (*People v. Abilez*, *supra*, 41 Cal.4th at p. 535).

### 4. *Delay in Execution After Lengthy Confinement*

Finally, defendant contends the delay in his execution—he has been on death row for over 13 years—constitutes cruel and unusual punishment under the federal and state Constitutions, "international law, covenants, treaties and norms." (See, e.g., *Lackey v. Texas* (1995) 514 U.S. 1045 (mem. of Stevens, J., on denial of cert.).)  "As explained in *People v. Anderson* [(2001)] 25 Cal.4th [543,] 606, 'we have consistently concluded, both before and since *Lackey*, that delay inherent in the automatic appeal process is not a basis for concluding that either the death penalty itself, or the process leading to its execution, is cruel and unusual punishment.' " (*People v. Brown* (2004) 33 Cal.4th 382, 404.)  Defendant advances no persuasive reason to reexamine this conclusion.

Further, any reliance on international law or extraterritorial decisional law has no bearing on the validity of a death sentence that satisfies federal and state constitutional mandates. (*People v. Brown*, *supra*, 33 Cal.4th at p. 404.)

### D. Cumulative Effect of Asserted Errors

Defendant argues that the cumulative effect of the guilt and penalty phase errors requires reversal of his conviction and death sentence even if no single error compels reversal. Whether considered singly or in combination, any error or assumed error was nonprejudicial.

### III. DISPOSITION

The judgment is affirmed.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**ASHMANN-GERST, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Vines

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S065720
**Date Filed:** May 19, 2011

_____

**Court:** Superior
**County:** Sacramento
**Judge:** James L. Long

_____

**Counsel:**

Gilbert Gaynor, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala G. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Patrick J. Whalen and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gilbert Gaynor
Law Office of Gilbert Gaynor
P.O. Box 41159
Santa Barbara, CA  93140-1159
(805) 962-5842

Michael Dolida
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 445-8538