Filed 3/12/15  P. v. Flores CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXANDER FLORES,<br><br>    Defendant and Appellant. | B248404<br><br>(Los Angeles County<br>Super. Ct. No. GA083755) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed.

Mark S. Shapiro for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II, Marc A. Kohm and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury found defendant and appellant Alexander Flores guilty of multiple counts of forcible rape and of sodomy by use of force against K.S.  On appeal, he contends that his trial counsel provided ineffective assistance by failing to "confront" evidence that a third party was responsible for K.S.'s injuries.  We reject the contention and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

I.      **Factual background.**

    A.      *Prosecution's case.*

On the night of June 17, 2011, K.S., a lesbian, went to a nightclub with friends and family, including her cousin, Gregory S. (Greg), who drove her to the club.[1]  At the club, K.S. met, for the first time, defendant.  He came with William Justin Mesa, K.S.'s friend and former boyfriend.  Defendant flirted with K.S., who was not interested.

Although K.S. had come to the club with Greg, he left without her.  At approximately 2:00 a.m., K.S. left the nightclub, thinking that Mesa would take her home.  Mesa instead told her that defendant would take her home.  Defendant drove K.S. home, and they went inside her apartment to eat some food defendant had bought.  K.S. thought that they would eat the food, but that was it:  she did not invite him in to have sex.

In her apartment, K.S. took off her shoes and went into her bedroom.  Uninvited, defendant came into her bedroom and pushed her onto the bed.  K.S. tried to get off the bed, but he pushed her back onto it.  K.S. told him, " 'No, I'm good,' " meaning she didn't want "to do this."  Defendant had one hand on her shoulder, and he was between her legs, removing the spanx she wore underneath her dress.  He put his penis in her vagina three times, and each time K.S. pushed back, once hitting her head on the wall.  Defendant tried to insert his penis into K.S.'s anus twice, and the third time she felt his penis go in and defendant climax.  Defendant threw a blanket over K.S. and left.

---

[1]      K.S.'s girlfriend was supposed to go with her that night, but she cancelled.

K.S. called Greg.  Greg and friends took K.S. to a hospital, where she was examined by a sexual assault nurse examiner on the afternoon of June 18, 2011.  Samples were obtained from K.S.'s vaginal and anal areas.  K.S. had "some tenderness to the lower aspect" of her vagina and "hymen," and a "notch," which is similar to a tear.  The nurse could not determine whether the notch was an old or new injury.  There was a redness to K.S.'s cervix.  K.S. had three lacerations to her rectal area.  K.S.'s injuries were consistent with forced intercourse and sodomy.

The Monday after the rape, K.S.'s family helped her move out of her apartment.  In her bedroom they found two used condoms.

DNA analysis included defendant as a "contributor" to K.S.'s vulva, vaginal, cervical, and external and internal anal samples.

B.      *Defense case*.

Defendant testified that he had consensual oral and vaginal sex with K.S.  He denied having anal sex with her.

Marc Taylor runs a laboratory that analyzes DNA.  He "re-analyzed" electronic data about K.S.'s samples, but he did not retest the samples.  As to the vulva sample, there was a mixture of two individuals, and defendant could not be excluded as a source of that DNA.  The other individual "is most likely another sperm donor."  The "unknown profile" in the vulva sample was not seen in any other sample.

## II.     Procedural background.

An information filed on August 16, 2011 alleged against defendant three counts of forcible rape under Penal Code section 261, subdivision (a)(2) (counts 1-3) and three counts of sodomy by use of force under Penal Code section 286, subdivision (c)(2)(A).  Because a first jury could not reach a unanimous verdict, the trial court declared a mistrial on July 9, 2012.

On January 28, 2013, a second jury found defendant guilty of three counts of forcible rape (counts 1-3) and of two counts of sodomy by use of force (counts 4 & 5).  The jury found him not guilty of count 6 for sodomy by use of force but guilty of the lesser offense of simple battery (Pen. Code, § 243, subd. (a)).

3

On April 29, 2013, the trial court sentenced defendant to six years on count 1, to three years on count 2, and to eight years on count 4, for a total of 17 years in prison. The court imposed concurrent sentences on counts 3 and 6.

## DISCUSSION

### I.     Ineffective assistance of counsel.

Defendant contends that his trial counsel was ineffective because he failed to comply with Evidence Code section 782[2] and to "confront the issue of appellant's DNA in [K.S.'s] anus." On this record, we find no ineffective assistance of counsel.

A.     *Additional background.*

On January 16, 2013, before trial, defense counsel represented that he would introduce impeachment evidence via a forensics expert, Taylor, who found DNA from a male donor other than defendant in one of K.S.'s samples. When counsel was unable to give the trial court additional information, such as which sample contained DNA from another male donor, the court said it would address the issue later in the day, when defense counsel had his expert's report. The record does not show that the issue was again discussed that day. Instead, defense counsel gave Taylor's report, dated January 22, 2013, to the court on January 23, 2013. Taylor thereafter testified for the defense that there was a second sperm donor in the DNA sample from K.S.'s vulva.

Thereafter, during a break in Mesa's testimony, the trial court said that since counsel had touched on DNA from another contributor, the court wanted the parties to discuss the admissibility of evidence under section 782. Defense counsel argued that the presence of DNA from a male donor other than defendant "would tend to prove that she recently had intercourse with another man" and "it could explain the presence of the injuries since [defendant] . . . will testify or will deny that he had anal intercourse with her." The parties and trial court then had this discussion:

---

[2]     All further undesignated statutory references are to the Evidence Code.

4

"The Court: So it's your argument that the unidentified fraction that was found in the vulva sample is evidence that she's had sexual intercourse with someone else and then that explains any injuries that she may have?"

"[Defense Counsel]: Well, I don't know that I plan on arguing that, but that's my own personal belief.

"The Court: But doesn't 782 say that you can't do that? 780 tells you when you can attack the credibility of a witness, and then 782 has a specific limitation that you cannot attack the credibility of a sexual assault victim by arguing that they've had previous sexual encounters. [¶] So before we get into that argument, I needed to know what your argument is going to be and right now I think that any discussion of the complaining witness' prior sexual conduct would be inadmissible. So unless you have another case or another theory, I'm going to exclude any argument on that. You can't tell the jury, you know, that she's had sex with other people so, therefore, she wasn't raped."

Defense counsel then proposed asking Mesa whether he'd had sex with K.S. since they broke up, some nine years ago: "[M]y offer of proof is that Justin Mesa would say that approximately—he couldn't specify, but a number of years after they broke up they were sexually intimate on one occasion, so it tends to prove that whatever animosity she claims existed between them at the time of the original breakup did not actually exist because on some level they were friendly." The court found that the evidence was irrelevant, unless Mesa had sex with K.S. the night before the one at issue; otherwise whether they had sex years or even months before was inadmissible under section 782.

B.    *The record fails to show that defense counsel provided ineffective assistance.*

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v.*

5

*Scott* (1997) 15 Cal.4th 1188, 1211-1212; see also *Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Homick* (2012) 55 Cal.4th 816, 893, fn. 44.) If the defendant makes an insufficient showing on either component, the claim fails. (*Homick*, at p. 893, fn. 44.) The claim also fails if the record sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *People v. Vines* (2011) 51 Cal.4th 830, 875-876; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

A reviewing court defers to " ' "counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citation.]' " (*People v. Hinton* (2006) 37 Cal.4th 839, 876; see also *People v. Carter, supra,* 30 Cal.4th at p. 1211.) "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington, supra,* 466 U.S. at p. 689.)

Here, defendant's first claim of ineffective assistance is premised on his trial counsel's alleged failure to present evidence under section 782. In a prosecution for sex

6

offenses, specific instances of a complaining witness's sexual conduct are not admissible to prove the witness's consent.  (§ 1103, subd. (c)(1); *People v. Fontana* (2010) 49 Cal.4th 351, 354.)  Such evidence, however, may be admissible when offered to attack the credibility of the complaining witness, provided that its probative value outweighs the danger of undue prejudice and the defendant otherwise complies with the procedures set forth in section 782.  That section requires the defendant to file a written motion and to make an offer of proof detailing the relevancy of the evidence.  (§ 782, subd. (a)(1) & (2); *Fontana*, at p. 362.)  If the court finds the offer sufficient, it shall order a hearing out of the jury's presence to allow questioning of the complaining witness regarding the offer of proof.  (§ 782, subd. (a)(3).)  If the court finds the evidence relevant under section 780 and admissible under section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted.  (§ 782, subd. (a)(4).)

To the extent defendant's claim of ineffective assistance of counsel is based on his trial counsel's failure to comply with the formal requirements of section 782, we discern no prejudice.  The trial court, despite the absence of a written motion, considered the admissibility of evidence under that section.  The court, for example, permitted the defense expert, Taylor, to testify that an unidentified man's sperm was found in K.S.'s vulva DNA sample.  Assuming that this evidence falls under section 782, it was admitted.

To the extent defendant's ineffective assistance claim is premised on his alleged failure to introduce other evidence under section 782, we also reject such a claim. Although a complaining witness's prior sexual conduct is inadmissible to prove her consent, section 1103, subdivision (c)(1) "does not bar evidence of the complaining witness's prior sexual conduct when offered to explain injuries the prosecution alleges were the result of the defendant's conduct."  (*People v. Fontana, supra,* 49 Cal.4th at p. 363.)  In *Fontana*, the victim alleged that the defendant raped her.  The defendant denied having sex with the victim.  (*Id.* at p. 359.)  He claimed that when the victim disrobed, he saw semen between the victim's legs.  The victim told a nurse that she had consensual sex with her boyfriend earlier in the day, before the defendant raped her.  (*Id.*

7

at p. 366.) Because some of the victim's injuries could be explained by her consensual activity with her boyfriend, *Fontana* found that the trial court should have conducted a hearing regarding the admissibility of that evidence. (*Id.* at pp. 366-368.)

Here, defense counsel asked permission to explore any sexual relationship Mesa had with K.S., who testified that although she was a lesbian she had also once dated Mesa. According to defense counsel's own offer of proof, however, Mesa and K.S. had not had a sexual relationship for years. Moreover, there was no suggestion that Mesa had sex with K.S. at any time near or on June 17, 2011 or that he was the unidentified source of sperm. Unlike in *Fontana*, there was no evidence that K.S.'s relationship with Mesa could explain her injuries. K.S.'s past sexual history with Mesa was therefore inadmissible under section 1103, subdivision (c)(1).

Defendant, however, asserts that his counsel should have more strongly "confronted" evidence that the existence of another man's sperm in K.S.'s vulva sample tended to show that someone other than defendant injured K.S. We still fail to perceive any ineffective assistance of counsel, because the issue was addressed. First, Taylor's testimony suggested that possibility. Second, defense counsel cross-examined the People's criminalist about the "presence of a male contributor in the vulva sperm fraction, a male contributor other than" defendant. She answered: "The data for this sample was very, very low level, what we call stochastic. In this range a partner allele can drop out. So as I said before, half from your mother, half from your father of your DNA. You are going to get one peak from your mom, one peak from your dad. At this low level where the vulva sample came out, you may see dropout of one or two of the peaks. [¶] And so all of the data in this sperm fraction of the vulva sample was at this low level except for at that one location. And so my experience I would not confidently say that other person was male, but I would say that there was another person there. It could be male or female." Defense counsel therefore *did* put evidence before the jury that K.S. recently had sex with another man, raising the inference that another person could be responsible for her injuries.

8

Third, the trial court expressly asked defense counsel if he was arguing that "the unidentified fraction that was found in the vulva sample is evidence that she's had sexual intercourse with someone else and then that explains any injuries that she may have?" Defense counsel said he did not plan on arguing that, although it was his personal belief. It therefore appears that defense counsel made a tactical decision to rely on the forensic evidence to imply that a third party was responsible for K.S.'s injuries. He may have made this decision because he simply had no other evidence to support that theory or he did not want to risk alienating the jury by appearing to cast aspersions on K.S. On this record, we cannot second guess that decision. (See generally *Strickland v. Washington, supra,* 466 U.S. at p. 689.)

Defendant's second claim of ineffective assistance of counsel is based on an alleged "failure to investigate the scientific" explanations for how defendant's DNA ended up in K.S.'s anal DNA sample.[3] But defendant's expert, Taylor, indirectly addressed this. When asked if Taylor attached any significance to the fact that the unknown profile was not seen on any other DNA sample, he answered: "It could have only been deposited externally. It might have been from an earlier encounter where a drainage was involved. We can't say. We just know that we see it on the external of the vulva sample. We are seeing a mix based on the extraction procedure. I would conclude that this is a mix of sperm from two individuals. But certainly that sperm could get there through any number of different sexual activities, and it could be sexual activities with two women if one of the women had had contact with a man earlier." This concept of "drainage" suggested that defendant's DNA could have been in K.S.'s anal sample even if, as defendant claimed, they only had vaginal sex.

Defense counsel also addressed the issue in his closing argument. After reminding the jury that defendant denied having anal sex with K.S., counsel argued: "But do you remember that Mr. Flores also told you that it was as he was seated down with an

---

**3**     Defendant asserts that this issue was crucial because the first jury asked, during deliberations, "Explain why there was evidence of [defendant's] DNA in anus but [defendant] denied anal intercourse[.]"

9

erection wearing no underwear, she straddled him. As he sat on the edge of the bed, she sat on top of him facing him with her genital areas exposed for some period of time. He told you that. [¶] So is it consistent or is it possible that that's how the DNA transfer occurred? We have no one on the prosecution's side to say that's not possible. Not one person came in from the prosecution's side and said, well, when a man is sitting on something with his genital areas exposed and having an erection and a woman is facing him straddling him also with her genital areas exposed, is it possible for the transfer of DNA. [¶] Nobody has told us that that's not possible. And it's not our burden to prove things to you. So there is no evidence to contradict that that's what happened."

Counsel also argued: "With respect to the anal sex, he's denied it. But how the DNA got there, how that redness ended up in her anal area, we don't know. We know that according to Marc Taylor and according to the People's own DNA experts there was a presence of what could be another male donor. [¶] Now, Mr. Taylor told you with more certainty than Ms. Fraser that it was a male donor. She told you it could be a male donor. It could be a female donor. Mr. Taylor was more certain. He said, 'No, it was a male donor.' "

Although his trial counsel therefore did explain how defendant's DNA could have ended up in K.S.'s anal sample if he didn't have anal sex with her and counsel did argue that issue to the jury, defendant suggests more should have been done. Again, we cannot second guess trial counsel's tactical decisions. (See, e.g., *People v. Vines, supra,* 51 Cal.4th at p. 876 [decision not to introduce third party culpability evidence was a tactical one]; *People v. Freeman* (1994) 8 Cal.4th 450, 498 ["The decision of how to argue to the jury after the presentation of evidence is inherently tactical"].)

Defendant also alludes to other evidence, which is not a part of the record on appeal, that might explain how his DNA ended up in the anal sample. Such claims are better raised by way of a writ of habeas corpus. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267 [direct appeal alleging ineffective assistance should be denied if the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged].)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KITCHING, Acting P. J.


EGERTON, J.[*]

---

[*] Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.